MORITT HOCK HAMROFF & HOROWITZ LLP
400 Garden City Plaza
Garden City, New York 11530
(516) 873-2000
(516) 873-2010 (fax)
Michael Cardello, Esq.
Counsel for Plaintiff, OpticsPlanet, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
OPTICSPLANET, INC., an Illinois corporation,            Civil Action No. 08-CV-6465 (RJS)

                                    Plaintiff,

                                                        **AFFIDAVIT IN SUPPORT OF**
            -against-                                   **DEFAULT JUDGMENT**

REGENCY GLOBAL SOLUTIONS, INC.
d/b/a PRECHARGE RISK
MANAGEMENT SOLUTIONS,
a Delaware corporation.

                        Defendant.
-------------------------------------------------------------------X

STATE OF NEW YORK     )
                      )     ss.:
COUNTY OF NASSAU      )


    **MICHAEL CARDELLO**, being duly sworn, deposes and says:

    1.      I am a member of the law firm of Moritt Hock Hamroff & Horowitz LLP ("Moritt

Hock"), counsel for OpticsPlanet, Inc. ("OpticsPlanet"), the plaintiff in the above entitled action.

As such, I am familiar with all of the facts and circumstances in this action.

    2.      I respectfully submit this affidavit pursuant to Rule 55 of the Federal Rules of

Civil Procedure and Rule 55.2 of the Local Civil Rules for the United States District Court for

the Southern District of New York, in support of OpticsPlanet's application for default judgment

against the defendant, Regency Global Solutions, Inc. d/b/a PreCharge Risk Management

Solutions ("PreCharge" or the "Defendant"). (A copy of a proposed form of default judgment is annexed hereto as **Exhibit "A"**).

3.      This action was commenced by the filing of a complaint on July 19, 2008 against PreCharge asserting three counts sounding in breach of contract, breach of warranty, and conversion arising out of the Defendant's failure to provide adequate services under the parties' agreements as well as converting monies rightfully belonging to OpticsPlanet.

## PROCEDURAL HISTORY

4.      This action was commenced on July 19, 2008 by the filing of a Complaint. (A true copy of the Complaint is annexed hereto as **Exhibit "B"**). Copies of the Summons and Complaint were served on PreCharge on July 23, 2008 by serving Anthony J. Costantini, Esq. authorized agent for of the Defendant. Service was made by overnight mail and acceptance of service was acknowledged by Anthony Costantini, Esq., in a letter dated July 23, 2008.[1] (Copies of the Certificate of Service and the Acknowledgement of Service are annexed hereto as **Exhibit "C"**).

5.      More than twenty (20) days have passed since the Summons and Complaint were served upon the Defendant, and no Answer or other responsive pleading has been served upon the undersigned, counsel for OpticsPlanet.

6.      On Wednesday August 13, 2008, after the time had expired to answer the Complaint on August 12, 2008, counsel for the Defendant requested of my office an extension of time to answer the Complaint. Counsel for the Defendant was informed that, as local counsel, we did not have authority to grant such a request and that he should contact lead counsel in

---

1 Mr. Constantini informed our office that, while he was authorized to act as an agent and accept service on behalf of the Defendant herein, that, as of July 23, 2008, he was not their counsel, nor would he be appearing on their behalf in this matter.

F:\OpticsPlanet\Regency Global\docs\Affidavit in support of Default Judgment FINAL.doc

Chicago, IL. According to a conversation with David Seidman, Esq.,[2] lead counsel for

OpticsPlanet, on Monday August 18, 2008, counsel for the Defendant requested an extension of

time to answer the Complaint (and hopefully reach a settlement) and was informed that Plaintiff

could not, and would not, consent to a long extension; however, Mr. Seidman agreed that

OpticsPlanet would not to take any action with the Court up to and including August 20, 2008.

Mr. Seidman further made opposing counsel aware of OpticsPlanet's desire to file a motion for

default after August 20, 2008, if necessary. As of the date of this Affidavit, counsel for

Defendant has not made any application to the Court for an extension of time to answer with

regard to the Complaint.    (A copy of the Court's docket for this matter, obtained through the

Court's PACER system, is annexed hereto as **Exhibit "D"**.)

## OPTICSPLANET IS ENTITLED TO ENTRY OF DEFAULT JUDGMENT IN ITS FAVOR

7.    Local Civil Rule 55.2(b) provides that:

> In all other cases the party seeking a judgment by default shall
> apply to the court as described in Federal Rule of Civil Procedure
> 55(b)(2), and shall append to the application (1) the clerk's
> certificate of default, (2) a copy of the claim to which no response
> has been made, and (3) a proposed form of default judgment.

8.    As stated above, the Defendant has not answered the Complaint, has not been

granted an extension of time by Counsel for OpticsPlanet to answer the Complaint, nor has it, as

of the date of this Affidavit, made an application to the Court for extension of time to answer or

otherwise move with respect to the Complaint. Accordingly, a Certificate of Default was issued

on August 21, 2008 (a copy of which is annexed hereto as **Exhibit "E"**) and OpticsPlanet

respectfully requests that, pursuant to Fed. R. Civ. Pro. 55(b)(2) and Local Civil Rule 55.2(b), a

---

2 David Seidman is admitted to practice law before the Courts of the State of Illinois and the District of Columbia
and counsel herein intends to file a motion for Mr. Seidman's admission to this Court *Pro Hac Vice* in short order.

F:\OpticsPlanet\Regency Global\docs\Affidavit in support of Default Judgment FINAL.doc

default judgment be entered against the Defendant in the amount of $151,472.10, plus interest at the federal statutory rate provided in 28 U.S.C. § 1961 from April 14, 2008 until the judgment is paid in full.

## BACKGROUND

9.      In or about July 2007, OpticsPlanet and PreCharge started discussing the possibility of working together.  Because OpticsPlanet does a substantial amount of business through internet sales, PreCharge's anti-fraud service offerings were appealing to OpticsPlanet.

10.      PreCharge's primary anti-fraud service offering is the prevention of "chargebacks."  A chargeback is the term used to describe a reversal of a credit/debit card transaction that takes place when a consumer files a complaint with its bank or credit/debit card provider.  The bank or credit/debit card provider then seeks the amount "charged back" to its cardholder from the merchant who sold the goods or services to the consumer.

11.      Frequently, chargebacks result from fraudulent transactions being entered into with merchants like OpticsPlanet.

12.      The parties entered into an agreement ("Original Agreement") on or about August 7, 2007.

13.      The parties entered into an amended agreement ("Amended Agreement") on or about March 3, 2008.

14.      The Amended Agreement lowered the rates OpticsPlanet paid to PreCharge for using its anti-fraud system.

15.      On or about March 11, 2008, OpticsPlanet gave PreCharge e-mail notice that it was overcharging OpticsPlanet under the Amended Agreement.

4

16.    Again on or about March 14, 2008, OpticsPlanet gave PreCharge e-mail notice that it was overcharging OpticsPlanet under the Amended Agreement.

17.    On or about April 14, 2008, more than thirty days after sending the latest notice to PreCharge informing them of the unacceptability of the rates being charged by to OpticsPlanet, OpticsPlanet terminated the Amended Agreement with PreCharge.

## HOW PRECHARGE CLAIMED ITS SYSTEM WOULD WORK

18.    It was explained that PreCharge's system would work as follows: (1) OpticsPlanet would receive an order from a customer; and (2) OpticsPlanet then would run the transaction through PreCharge's system to determine whether the consumer information appears to be authentic or fraudulent.

19.    If PreCharge determined that the customer information appeared to be authentic, then OpticsPlanet would enter into the transaction.

20.    If PreCharge's system deemed the contract to be fraudulent, then OpticsPlanet would have two options: (1) not to enter into the transaction; or (2) enter into the transaction without any contractual protection from PreCharge.

21.    OpticsPlanet paid PreCharge for the services pursuant to these contracts. Through the parties' agreements, PreCharge could electronically transfer money out of OpticsPlanet's bank account.

22.    Both the Original Agreement and the Amended Agreement include a warranty by PreCharge. Quoting Section 1.1 of the Original Agreement, PreCharge "agrees to warranty any Company-Approved Transaction against fraud or Chargeback, based on the provisions and Transaction fees as defined in this Agreement...." (Complaint, Exhibit "B") The phrasing of

Case 1:08-cv-06465-RJS   Document 5   Filed 08/26/2008   Page 6 of 9

Section 1.1 in the Amended Agreement is nearly identical, thereby providing the same warranty. (Complaint, Exhibit B).

23.     Under both the Original Agreement and the Amended Agreement, PreCharge approved many customer transactions for OpticsPlanet. OpticsPlanet has notified PreCharge of more than $67,000 in charge backs for which PreCharge has not made any warranty payments to OpticsPlanet. In total, PreCharge owes OpticsPlanet more than $103,000 for these claims.

24.     PreCharge has not challenged OpticsPlanet's demand for payment for any of the transactions listed in the Complaint. OpticsPlanet anticipates an additional substantial amount in chargebacks from previously approved PreCharge transactions in the future. PreCharge must compensate OpticsPlanet for these future chargebacks.

25.     OpticsPlanet and PreCharge agreed to specific rates of service in the Original Agreement and the Amended Agreement.

26.     PreCharge had the contractual right to take money out of OpticsPlanet's account for fees it actually earned. PreCharge, however, withdrew tens of thousands of dollars that it never earned.

27.     Under the Terms of the Original Agreement and the Amended Agreement, OpticsPlanet should pay preCharge only if a transaction was consummated between a customer and OpticsPlanet. Yet OpticsPlanet paid PreCharge more than $25,000 for services that should never have been paid.

28.     These overpayments were made solely because PreCharge took the funds out of OpticsPlanet's account without OpticsPlanet's authorization.

F:\OpticsPlanet\Regency Global\docs\Affidavit in support of Default Judgment FINAL.doc

29.     Moreover, PreCharge failed to apply the reduced rate structure in the Amended
Agreement and instead continued to charge OpticsPlanet under the terms of the Original
Agreement.  As a result, OpticsPlanet paid PreCharge more than $5,000 than was due.

30.     These overpayments were made solely because PreCharge took the funds out of
OpticsPlanet's account without OpticsPlanet's authorization.

31.     OpticsPlanet was enticed by PreCharge's statements that its services were
adaptable to all forms of internet commerce.  OpticsPlanet needed a customized approach to
protect its web site from fraud and chargebacks.  PreCharge promised to provide customized
protection.  For example, OpticsPlanet sells various products that are purchased by law
enforcement and other governmental agencies.  Transactions intending to ship products to
governmental agencies are almost always fulfilled because (1) fraudsters do not ship to
government agency addresses; and (2) a government agency credit or debit card is a very strong
indicator that payment will be made. OpticsPlanet informed PreCharge of this fact on several
occasions after the parties entered into the Original Agreement.

32.     PreCharge's decision not to approve several orders placed by federal agencies and
law enforcement agencies created a number of operational problems for OpticsPlanet.

33.     For other transactions, PreCharge unilaterally decided to contact OpticsPlanet's
prospective customers to determine whether a proposed transaction was fraudulent.  Such actions
were outside the scope of the contracts between the parties.  OpticsPlanet never gave PreCharge
the right to contact its customers.

## PROPOSED DAMAGES AND BASIS FOR THE DAMAGES

34.     Damages are calculated as follows: With respect to the First and Second Counts
sounding in breach of contract and warranty, the Defendant, under the terms and condition of the

Agreements entered into by the parties owes the sum of $151,472.10.  The sums due and owing

are broken down as follows:

| | |
|---|---|
| Total Discrepancy in Fees | $35,723.89 |
| Pending Voids | $335.86 |
| Total Chargebacks Pending | $110,412.35 |
| Estimated Future Chargebacks | $5,000.00 |
| **Total Amount Owed to OP** | **$151,472.10** |

35.    With regard to the third count sounding in conversion, OpticsPlanet has suffered

damages in the amount of $35,723.89, which is the "Total Discrepancy in Fees" line item above.

OpticsPlanet recognizes that it cannot claim double recovery for the amount of $35,723.89, listed

as the "Total Discrepancy in Fees" above.  This claim is based upon PreCharge's unauthorized

withdrawal of monies from the account of OpticsPlanet for services never performed by

PreCharge.  As the Court can see from the chart below, PreCharge billed and collected over

$121,946.26 but only rendered services totaling $86,215.05.

| | |
|---|---|
| Total Fees Billed by preCharge | $121,946.26 |
| Total Fees Collected by preCharge | $121,938.94 |
| Total Fees Calculated by OP | $86,215.05 |
| Total Discrepancy in Fees | $35,723.89 |

## CONCLUSION

For the foregoing reasons, the default judgment should be entered against defendant Regency Global Solutions, Inc. d/b/a PreCharge Risk Management Solutions in the amount of $151,472.10, plus interest at the federal statutory rate provided in 28 U.S.C. § 1961 from April 14, 2008 until the judgment is paid in full and such other relief as the Court deems just and proper.

_____
MICHAEL CARDELLO III

Sworn to before me this
22 day of August, 2008.

Doreen C. Sarovec
Notary Public, State of New York
No. 5000920
Qualified in Suffolk County
Commission Expires August 24, 2010

F:\OpticsPlanet\Regency Global\docs\Affidavit in support of Default Judgment FINAL.doc

MORITT HOCK HAMROFF & HOROWITZ LLP
400 Garden City Plaza
Garden City, New York 11530
(516) 873-2000
(516) 873-2010 (fax)
Michael Cardello, Esq.
Counsel for Plaintiff, OpticsPlanet, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

OPTICSPLANET, INC., an Illinois corporation,        Civil Action No. 08-CV-6465 (RJS)

                Plaintiff,

                                **DEFAULT JUDGMENT**

      -against-

REGENCY GLOBAL SOLUTIONS, INC.
d/b/a PRECHARGE RISK
MANAGEMENT SOLUTIONS,
a Delaware corporation.

                Defendant.
------------------------------------------------------------------X

      This action having been commenced on July 19, 2008 by the filing of the

Summons and Complaint, and a copy of the Summons and Complaint having been served on the

Defendant Regency Global Solutions, Inc. d/b/a PreCharge Risk Management Solutions, on July

23, 2008 by serving Anthony J. Costantini, Esq. authorized agent for of the Defendant by

overnight mail, service and acceptance of which was acknowledged by Anthony Costantini, Esq.

and a proof of service having been filed on July 29, 2008 and the Defendant not having answered

the Complaint, and the time for answering the Complaint having expired, it is

      ORDERED, ADJUDGED AND DECREED:  That the Plaintiff have judgment

against Defendant in the liquidated amount of $151,472.10 plus interest at the federal statutory

rate provided in 28 U.S.C. § 1961 of _____% from April 14, 2008 until the judgment is paid in

full amounting to $_____ plus costs and disbursements of this action in the amount of

$_____ amounting in all to $_____.


Dated: New York, New York

_____, 2008


_____
                    U.S.D.J.

This document was entered on the docket on
_____, 2008.

F:\OpticsPlanet\Regency Global\docs\Default Judgment.Proposed.doc

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

JUDGE SULLIVAN

| | | |
|---|---|---|
| OPTICSPLANET, INC., an Illinois corporation | ) ) ) | Case No. 08 CV 6465 |
| Plaintiff, | ) ) ) | Date Filed: |
| v. | ) ) ) | |
| REGENCY GLOBAL SOLUTIONS, INC. d/b/a PRECHARGE RISK MANAGEMENT SOLUTIONS, a Delaware corporation | ) ) ) ) ) | |
| Defendant. | ) ) | |

RECEIVED
JUL 19 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## COMPLAINT

Plaintiff OpticsPlanet, Inc. ("OpticsPlanet"), for its Complaint against Regency

Global Solutions, Inc. d/b/a Precharge Risk Management Solutions ("preCharge") states

as follows:

### INTRODUCTION

This is a classic case of a service provider overpromising and underdelivering.

The contract at issue here concerns preCharge's provision of anti-fraud software to

ensure OpticsPlanet avoided entering into fraudulent transactions with bogus customers.

Unfortunately, preCharge failed to provide adequate service. Thus, under the parties'

agreements OpticsPlanet is entitled to more than $100,000 resulting from preCharge's

failure to prevent OpticsPlanet from entering into fraudulent or "charged back"

transactions.

Making matters worse, preCharge took money from OpticsPlanet without its

consent. Under the parties' agreements, preCharge had access to OpticsPlanet's bank

account to receive payments it earned. But this was not enough—preCharge resorted to taking OpticsPlanet's money, without its consent, for (1) services that were not compensable under the parties' agreements; and (2) higher rates that were inoperable after the parties amended their original agreement.

## PARTIES

1. OpticsPlanet is an Illinois corporation with its principal place of business in Northbrook, Illinois. OpticsPlanet is an internet retailer of optical equipment and many other products and also accepts orders via telephone.

2. PreCharge is a Delaware corporation with its principal place of business in the Southern District of New York in New York, New York. PreCharge provides anti-fraud services to companies who engage in internet commerce.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to adjudicate each of the claims in this civil proceeding pursuant to 28 U.S.C. §1332 because there is diversity of citizenship and the amount in controversy exceeds the sum of $75,000.00, exclusive of interests and costs.

4. Venue is proper in this judicial district pursuant to 28 U.S.C. §1391. Venue in this Court is proper based upon the provisions of 28 U.S.C. §1391(a).

## OPTICSPLANET AND PRECHARGE ENTER INTO A CONTRACT

5. In or about July 2007 OpticsPlanet and preCharge started discussing the possibility of working together. Because OpticsPlanet does a substantial amount of business through internet sales, preCharge's anti-fraud service offerings were appealing to OpticsPlanet.

6. PreCharge's primary anti-fraud service offering is the prevention of "chargebacks." A chargeback is the term used to describe a reversal of a credit/debit card transaction that takes place when a consumer files a complaint with its bank or credit/debit card provider. The bank or credit/debit card provider then seeks the amount "charged back" to its cardholder from the merchant who sold the goods or services to the consumer.

7. Frequently, chargebacks result from fraudulent transactions being entered into with merchants like OpticsPlanet.

8. The parties entered into an agreement (Original Agreement) on or about August 7, 2007. (Exhibit A).

9. The parties entered into an amended agreement (Amended Agreement) on or about March 3, 2008. (Exhibit B)

10. Of note, the Amended Agreement lowered the rates OpticsPlanet paid to preCharge for using its anti-fraud system.

11. On or about March 11, 2008, OpticsPlanet gave preCharge e-mail notice that it was overcharging OpticsPlanet under the Amended Agreement. (Group Exhibit C)

12. Again on or about March 14, 2008, OpticsPlanet gave preCharge e-mail notice that it was overcharging OpticsPlanet under the Amended Agreement. (Group Exhibit C)

13. More than thirty days after sending this notice of the unacceptability of the rates being charged by preCharge, on or about April 15, 2008, OpticsPlanet terminated the Amended Agreement with preCharge. (Exhibit D)

## HOW PRECHARGE IS CLAIMED ITS SYSTEM WOULD WORK

14. Generally, the working relationship between OpticsPlanet and preCharge worked like this: (1) OpticsPlanet would receive an order from a customer; and (2) OpticsPlanet then would run the transaction through preCharge's system to determine whether the consumer information appears to be authentic or fraudulent.

15. If preCharge determined that the customer information appeared to be authentic, then OpticsPlanet would enter into the transaction.

16. If preCharge's system deemed the contract to be fraudulent, then OpticsPlanet would have two options: (1) not to enter into the transaction; or (2) enter into the transaction without any contractual protection from preCharge.

17. OpticsPlanet paid preCharge for the services pursuant to these contracts. Through the parties' agreements, preCharge could electronically transfer money out of OpticsPlanet's bank account. PreCharge could do so without first providing OpticsPlanet an invoice or other notification of its intent to withdraw funds.

## PRECHARGE OWES OPTICSPLANET MORE THAN $100,000 UNDER THE PARTIES' AGREEMENTS

18. Both the Original Agreement and the Amended Agreement include a warranty by preCharge. Quoting Section 1.1 of the Original Agreement, preCharge "agrees to warranty any Company-Approved Transaction against fraud or Chargeback, based on the provisions and Transaction fees as defined in this Agreement...." (Exhibit A) The phrasing of Section 1.1 in the Amended Agreement is nearly identical, thereby providing the same warranty. (Exhibit B)

19. Under both the Original Agreement and the Amended Agreement, preCharge approved many customer transactions for OpticsPlanet. OpticsPlanet has made preCharge aware of more than $67,000 in charge backs for which preCharge has not made any warranty payments to OpticsPlanet. (Exhibit D). This figure now exceeds $103,000.

20. OpticsPlanet is still waiting for preCharge to fulfill its obligations. In total, preCharge owes OpticsPlanet more than $103,000 for these claims.

21. PreCharge has not challenged OpticsPlanet's demand for payment for any of the transactions listed in Group Exhibits E and F in any way. Nor has preCharge provided any indication that any additional investigation is needed beyond its normal internal procedures. Instead, preCharge has made repeated statements that it needed to analyze the relevant information. Upon information and belief, no comprehensive analysis was ever performed by preCharge.

22. OpticsPlanet anticipates an additional substantial amount in chargebacks from previously approved preCharge transactions in the future. PreCharge must compensate OpticsPlanet for these future chargebacks.

## PRECHARGE TAKES MONEY FROM OPTICSPLANET WITHOUT AUTHORIZATION FOR FEES THAT WERE NEVER EARNED

23. OpticsPlanet and preCharge agreed to specific rates of service in the Original Agreement and the Amended Agreement. Those rates are listed in Exhibits A and B.

24. PreCharge had the contractual right to take money out of OpticsPlanet's account for fees it actually earned. PreCharge, however, withdrew tens of thousands of dollars that it never earned. OpticsPlanet considers these actions to be theft.

25. Under the Terms of the Original Agreement and the Amended Agreement, OpticsPlanet should pay preCharge only if a transaction was consummated between a customer and OpticsPlanet. Yet OpticsPlanet paid preCharge more than $25,000 for services that should never have been paid.

26. These overpayments were made solely because preCharge took the funds out of OpticsPlanet's account without OpticsPlanet's authorization.

27. Moreover, preCharge failed to apply the reduced rate structure in the Amended Agreement. As a result, OpticsPlanet paid preCharge more than $5,000 than was due.

28. These overpayments were made solely because preCharge took the funds out of OpticsPlanet's account without OpticsPlanet's authorization.

### PRECHARGE'S ANTI-FRAUD COMPUTERIZED SYSTEM WAS DEFICIENT—PRECHARGE EVEN HAD TO CALL PROSPECTIVE CUSTOMERS

29. OpticsPlanet was enticed by preCharge's statements that its services were adaptable to all forms of internet commerce. In one e-mail, Howard Schecter, a preCharge employee, states "[B]eing that preCharge doesn't take a one size fits all approach, the service is tailored to all types of merchants." (Exhibit E)

30. OpticsPlanet needed a customized approach to protect its web site from fraud and chargebacks. PreCharge promised to provide customized protection. For example, OpticsPlanet sells various products that are purchased by law enforcement and other governmental agencies. Transactions intending to ship products to governmental agencies are almost always fulfilled because (1) fraudsters do not ship to government agency addresses; and (2) a government

agency credit or debit card is a very strong indicator that payment will be made. OpticsPlanet informed preCharge of this fact on several occasions after the parties entered into the Original Agreement.

31. PreCharge's decision not to approve several orders placed by federal agencies and law enforcement agencies created a number of operational problems for OpticsPlanet.

32. For other transactions, preCharge unilaterally decided to contact OpticsPlanet's prospective customers to determine whether a proposed transaction was fraudulent. Such actions were outside the scope of the contracts between the parties. OpticsPlanet never gave PreCharge the right to contact its customers.

## COUNT I – BREACH OF CONTRACT

33. OpticsPlanet adopts and incorporates paragraphs 1 through 32 as paragraph 33 of Count I.

34. OpticsPlanet and preCharge duly executed two contracts for anti-fraud services. (Exhibits A and B)

35. OpticsPlanet paid preCharge for the services pursuant to these contracts.

36. Through the parties' agreements, preCharge could electronically transfer money out of OpticsPlanet's bank account without first providing OpticsPlanet an invoice or other notification of its intent to withdraw funds.

37. OpticsPlanet overpaid money to preCharge because preCharge overcharged for its services. None of this money has been returned to OpticsPlanet.

38. OpticsPlanet paid additional money to preCharge for services that should never have been charged to OpticsPlanet. None of this money has been returned to OpticsPlanet.

39. PreCharge is contractually bound to pay OpticsPlanet for all "chargebacks" for transactions approved by preCharge. PreCharge has failed to pay OpticsPlanet more than $100,000 for chargebacks. This unpaid amount is more than 70% of all chargeback activity to date.

40. OpticsPlanet seeks compensation from preCharge for failing to provide the services under the contract in an adequate or competent manner. This caused OpticsPlanet to incur damages including the costs associated with correcting the inadequate services it received.

41. As a result of preCharge's breach, OpticsPlanet, Inc., seeks judgment in its favor against preCharge for actual damages in excess of $75,000, punitive damages, attorneys fees, prejudgment interest and costs.

## COUNT II – BREACH OF WARRANTY

42. OpticsPlanet adopts and incorporates paragraphs 1 through 32 as paragraph 42 of Count II.

43. PreCharge approved more than $150,000 in transactions that were executed between OpticsPlanet and various OpticsPlanet customers that resulted in chargebacks. The warranties in the contracts between OpticsPlanet and preCharge govern these transactions.

44. PreCharge has failed to pay OpticsPlanet more than $103,000 for warrantied transactions that resulted in chargebacks. OpticsPlanet demanded payment for

these warrantied transactions on multiple occasions. PreCharge has not provided any explanation why payment has not been made.

45. PreCharge failed to provide services consistent with applicable industry standards. Upon information and belief, various aspects of its anti-fraud system were not able to meet the needs of OpticsPlanet's operational needs. Upon information and belief, preCharge's anti-fraud system could not handle the various basic needs of retailers like OpticsPlanet.

46. As a result of preCharge's breach, OpticsPlanet, Inc., seeks judgment in its favor against preCharge for actual damages in excess of $75,000, punitive damages, attorneys fees, prejudgment interest and costs.

## COUNT III – CONVERSION

47. OpticsPlanet adopts and incorporates paragraphs 1 through 32 as paragraph 47 of Count III.

48. Though the parties' agreements, preCharge could electronically transfer money out of OpticsPlanet's bank account. PreCharge could do so without first providing OpticsPlanet an invoice or other notification of its intent to withdraw funds.

49. Using this contractual authority, preCharge withdrew more than $25,000 for services that preCharge should never have charged OpticsPlanet for under the contract. Further, preCharge withdrew more than $5,000 through overcharging OpticsPlanet for services under the Amended Agreement. OpticsPlanet believes this money was stolen by preCharge.

50. OpticsPlanet has a possessory interest and right in the improperly withdrawn funds. It is OpticsPlanet's money. OpticsPlanet has a right to immediate possession of the improperly withdrawn funds.

51. PreCharge is holding this money in derogation of OpticsPlanet's possessory interest and right.

52. OpticsPlanet has demanded return of the funds. PreCharge has failed to comply with this request.

53. As a result of the preCharge's conversion, OpticsPlanet, Inc., seeks judgment in its favor against preCharge for actual damages in excess of $30,000, punitive damages, attorneys fees, prejudgment interest and costs.

WHEREFORE, Plaintiff OpticsPlanet, Inc., respectfully requests:

A. The Court enter a judgment, on Count I herein, in its favor and against Defendant Regency Global Solutions d/b/a Precharge Risk Management Solutions, for actual damages in excess of $75,000, punitive damages, attorneys fees, prejudgment interest, costs, and such other relief as the Court deems just and proper.

B. The Court enter a judgment, on Count II herein, in its favor and against Defendant Regency Global Solutions d/b/a Precharge Risk Management Solutions, for actual damages in excess of $75,000, punitive damages, attorneys fees, prejudgment interest, costs, and such other relief as the Court deems just and proper.

C. The Court enter a judgment, on Count III herein, in its favor and against

Defendant Regency Global Solutions d/b/a Precharge Risk Management Solutions, for

actual damages in excess of $30,000, punitive damages, attorneys fees, prejudgment

interest, costs, and such other relief as the Court deems just and proper.

Dated: Garden City, New York
      July 18, 2008

                MORITT HOCK HAMROFF & HOROWITZ LLP
                Attorneys for Plaintiff

                By: *Michael Cardello*
                    Michael Cardello, III, Esq.
                400 Garden City Plaza
                Garden City, New York 11530
                (516) 873-2000

                David Seidman, Esq.
                (Motion for Admission Pro Hac Vice to follow)
                ENTERPRISE LAW GROUP, LLP
                70 W. Madison St., Suite 740
                Chicago, Illinois 60602
                312-578-0200

# Exhibit "A"



This agreement is entered into by and among the entities on this preCharge Certified Payments Application in and between the referenced parties (the "Merchant") on this application and preCharge Risk Management Solutions (the "Company") in accordance with the terms as follow:

WHEREAS, Merchant finds that the Company is willing to perform services hereinafter described in accordance with the provisions of this Agreement; and WHEREAS, The Merchant finds that the Company is qualified to perform the services, all relevant factors considered, and that such performance will be in furtherance of Merchant's business. NOW, THEREFORE, in consideration of the mutual covenants set forth herein and intending to be legally bound, the parties hereto agree as follows:

## INTERPRETATION

The following terms shall have the definitions indicated below unless otherwise expressly stated herein:

"Agreement" means this preCharge Certified Payments Merchant Agreement including, without limitation, any schedules amendments revisions or replacements thereof.

"Approved Transaction" means any Transaction that is processed (i) pursuant to the terms hereof; (ii) for the benefit of a Merchant.

"Card Association" means Visa, MasterCard or any other Card Issuers that provide Cards that are accepted by Merchant by agreement with a Member Bank.

"Card" means a valid credit or debit card as issued under license from Visa or MasterCard or any other valid credit card, charge card or debit card accepted as a method of payment by Merchant with prior written approval of Company.

"Cards" has the meaning ascribed thereto in section hereof.

"Chargeback" means a Transaction that has been returned to the Merchant by the Card Issuer in accordance with the Rules.

"Company" has the meaning ascribed thereto in the preamble hereof.

"Customer" means an individual to whom a Card has been issued by a Member Bank and who wishes to purchase goods or services from the Merchant and use such Card to facilitate payment.

"Fees" means the consideration to be paid by Merchant to Company for Services rendered by Company hereunder, as further defined in Schedule A hereto.

"Fraud Score" means score provided for all transactions, ranging from 0 to 1000.

"MasterCard" means MasterCard International, Inc.

"Member Bank" means any member of Visa or MasterCard that provides Merchant Card Services.

"Merchant" has the meaning ascribed thereto in the preamble hereof.

"Merchant Account" means a specific account established by a Member Bank for the processing of a Merchants Card Transactions.

"Merchant Agreement" means an agreement between Member Bank and a Merchant, and possibly others, whereby Member Bank agrees to provide Services to Merchant.

"Merchant Services" means the acceptance, processing and collection of Transactions on behalf of Merchants by Member Bank including, without limitation, credit review, and approval of Merchant, clearing and settlement of Transactions, customer services as well as return, Chargeback and retrieval services.

"Rules" means the bylaws, rules, regulations and procedures established by MasterCard and Visa, and any bylaws, rules, regulations and procedures imposed by any other approved Card licensor.

"Services" has the meaning ascribed thereto in section 1.1 hereof. "Transaction" means (i) the purchase by a Customer of goods or services from Merchant, through the use of a Card, (ii) other types of payment related Transactions, (iii) non-purchase Transactions between Customers and Merchants, and (iv) any other Transaction related to the Merchant Services.

"Transaction" means any sale of goods or services, or credit for such, from a Merchant for which the customer makes payment through the use of any Card and which is then presented to a Member Bank for collection;

"Visa" means Visa U.S.A., Inc. or Visa International, Inc.

## 1. SERVICES TO MERCHANT

The Company shall provide to the Merchant the following: Company, whether dealing with the public or otherwise, shall honor, in a non-discriminatory manner, all valid cards ("Cards") of the type(s) indicated, when properly presented as payment in connection with bona fide legitimate business Transaction, provided that said Transaction receives a Fraud Score of 750 or below. Access to the Company's Secure API and all related linking options, as well as the Company's Merchant Interface, shall be provided pursuant to the terms hereof. Subject to the terms hereof, preCharge hereby agrees to provide fraud protection warranty on all Chargeback activity in the account of the Merchant.

### 1.1 Transaction Warranty

Company hereby agrees to warranty any Company-Approved Transaction against fraud or Chargeback, based on the provisions and Transaction fees as defined in this agreement, provided that Merchant and all of its affiliates is in full compliance of this agreement and any other agreement with Company or any of its affiliates, to which they may be a party, and Merchant maintains a current working relationship with Company with all current and past Transaction fees due and paid on time and in the amounts agreed (collectively, the "Services"). For greater certainty, Services do not include, without limitation, the supply of any merchant account, merchant acquiring services, processing, ACH, check processing, gateway, gift card, loyalty or shopping cart services (collectively, "Merchant Account Services").

## 2. PAYMENT AND INVOICING TERMS

### 2.1 Payment for Services

Payment is due in full in accordance with the Fees as described in this application. All Fees are paid upfront, before the month of service, and Merchant instructs Company to debit them via ACH/EFT Automated Transfers from the account designated by the Merchant at the beginning of such month. Company reserves the right, at its sole and absolute discretion, to delay billing of Fees and charges hereunder.

### 2.2 Service Rates

Fees do not include, without limitation, any service fees currently paid to or payable to providers of Merchant Account Services or parties affiliated or related thereto and do not invalidate any such contracts.

© 2003-2007 preCharge Risk Management Services. All Rights Reserved
preCharge Merchant Agreement v0407

Exhibit A



This Agreement at no time substitutes any existing agreements between Merchant and any third party. Fees may be adjusted, at the sole and absolute discretion of Company, throughout term hereof, following 30 day written notice by Company.

All Transaction Fees are calculated at the time said Transaction is submitted, based on the fraud score as solely determined by Company, which examines over 100 variables at the time of submission of such Transaction to Company.

If Merchant has any valid reason for disputing any portion of an invoice from Company, Merchant must notify the Company in writing within 30 calendar days of receipt of Invoice by Merchant. If no such notification is given, the invoice will be deemed valid and accepted by Merchant. In the case of a dispute, the portion of the Company's invoice which is not in dispute shall be paid in accordance with the procedures set forth herein.

A finance charge of three percent (3%) in excess of the Wall Street Journal Prime Rate as of the day that payment was due, will be charged on past due accounts. Payments by Merchant will thereafter be applied first to accrued interest and then to the principal unpaid balance. Any attorney fees, court costs, or other costs incurred in collection of delinquent accounts shall be paid by Merchant. If payment of invoices is not current, the Company may terminate the supply of Services without prior notice to Merchant.

### 2.3 Taxes
All amounts payable pursuant to this Agreement are exclusive of taxes. Accordingly, there will be added to any such amount payable by Merchant the monetary sum equal to any and all current and future applicable taxes, however designated, incurred as a result of or otherwise in connection with this Agreement or the Services, including without limitation state and local, excise, sales, services, withholding, and use taxes and any taxes or other amounts in lieu thereof paid or payable by Merchant (other than taxes based on the Merchant's net income). If Merchant does not pay such taxes, the Company may make such payments and Merchant will reimburse the Company for those payments. Merchant will hold the Company harmless for any payments made by Merchant pursuant to this Section 2.4.

### 2.4 Refunds
The Company setup includes but is not limited to, purchase of preCharge Merchant ID and related integration support. Ongoing services include Transaction review, fraud screening and warranty services. Once an application has been submitted, no refund shall be honored. Once a Transaction has been approved, no refund shall be honored.

### 2.5 Representations, Warranties and Covenants of Merchant
Merchant agrees, represents, warranties and covenants to and for the benefit of Company that as of the execution hereof and during the term hereof:

a) Good Standing. If the Merchant is an individual, the Merchant is the age of eighteen (18) years and of the age of majority in the State where they are domiciled and are fully competent to enter into this Agreement. If the Merchant is a corporation or otherwise incorporated or formed, it is validly existing and in good standing under the laws of the State where its principal office is located;

b) Full Authority. Merchant representative has full authority and corporate power to enter into this Agreement and to perform its obligations under this Agreement;

### preCharge Certified Payments
### Merchant Agreement

c) Sale of Information. Merchant shall not sell, purchase, provide or exchange credit card, debit card or bank account numbers or Customer or Card holder information, or any information collected or received hereunder, to any third party, any and all such information being the sole and exclusive property of the Bank or the Merchant;

d) No Violation. Merchant's performance of this Agreement will not violate any applicable law or regulation or any agreement to which it is bound as of the date hereof, including, without limitation, the Merchant Agreement;

e) Enforceability. This Agreement represents a valid obligation of Merchant and is fully enforceable against it;

f) Compliance. Merchant will comply with the terms of this Agreement, with all applicable bank card association and ACH network rules, including, without limitation, those of NACHA, and with all applicable state and federal laws and regulations and any agreement between the Company and a Bank, as well as all applicable Bank ethics statements;

g) No Litigation. Neither Merchant, nor its officers or directors, nor any affiliates of Merchant are a party to any pending litigation that would have an impact on this Agreement and have never been fined or penalized by Visa, MasterCard, NACHA or any other association in the credit, payments or banking industry;

h) No Crime. No Merchant or any of its principles has ever been convicted of a crime punishable by greater than 365 days of incarceration or of a crime of dishonesty;

i) Laws. Merchant agrees that it will not perform any act which would violate New York State or United States Federal Law or any other applicable domestic or foreign law.

## 3. CHANGES

Merchant may, with the approval of the Company, issue written directions within the general scope of any Services to be ordered. Such changes may be directed to change the direction of the work covered by the Task Order, but no change will be allowed unless agreed to by the Company in writing. Merchant agrees and acknowledges that changes in the Services may entail increases in Fees, as determined by the Company.

## 4. STANDARD OF CARE

The Company warrants that its services shall be performed by personnel possessing competency consistent with applicable industry standards. No other representation, express or implied, and no warranty or guarantee is included or intended in the Agreement, or in any report, opinion, deliverable, work product, document or otherwise. Furthermore, no guarantee is made as to the efficacy or value of any services performed or software developed.

THIS SECTION SETS FORTH THE ONLY WARRANTIES PROVIDED BY THE COMPANY CONCERNING THE SERVICES AND RELATED WORK PRODUCT. THIS WARRANTY IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT, TITLE OR OTHERWISE EXPRESSED IN THIS AGREEMENT.

 **preCharge**

**preCharge Certified Payments**

# Merchant Agreement

## 5. LIABILITY

### 5.1 Transaction Warranty

The Merchant agrees that the Company shall not be responsible for any of the following kinds of Transactions; (i) Transaction that does not receive an approved preCharge Transaction code; (ii)Transaction submitted before the final execution of this agreement; (iii)Transaction that does not receive Merchant bank approval; (iv) Transaction exceeding the maximum allowed limit under this contract, as set out in Schedule A; (v) Transaction submitted by a Cardholder previously known to the merchant to have fraudulent or Chargeback activity; (vi)Transaction that does not match the Chargeback amount; (vii) Transaction that has failed requirements, in the event of requirements made by the Merchant Bank; (viii) Transaction that does not fall under Merchant's standard internet or other operations; (ix) Transaction that has already received a partial refund; (x) Transaction submitted in an attempt to receive multiple approval codes for a single Transaction; (xi) Transaction for a Cardholder who is a shareholder, director, officer, employee, agent or representative of Merchant or any of its affiliates; (xii) Transaction that has been knowingly by the merchant submitted in violation of any applicable Rule, law or regulation; (xiii) Transaction submitted when Merchant is in violation of any applicable Rule, law or regulation.

### 5.2 Limitation

The Company's liability, including but not limited to Merchant's claims of contributions and indemnification related to third party claims arising out of services rendered by the Company, and for any losses, injury or damages to persons or properties or work performed arising out of or in connection with this Agreement and for any other claim, shall be limited to payment received by the Company from Merchant for the particular Service provided giving rise to the claim minus any payments made to Merchant and Fees for Services rendered. Notwithstanding anything to the contrary in this Agreement, the Company shall not be liable for any special, indirect, consequential, lost profits, or punitive damages. Merchant agrees to limit the Company's liability to Merchant and any other third party for any damage on account of any error, omission or negligence to a sum not to exceed the payment received by the Company for the particular service provided giving rise to the claim. The limitation of liability set forth herein is for any and all matters for which the Company may otherwise have liability arising out of or in connection with this Agreement, whether the claim arises in contract, tort, statute, or otherwise. Company assumes no liability for any fines imposed on Merchant by Visa, MasterCard or any other association of banks or regulatory agency.

### 5.3 Processing

At no time will Company be held liable for any Transaction submitted by Merchant that does not fall under Merchant's standard operations or charged by Merchant's merchant account for another business's activity.  Merchant shall provide Company with a list of all Merchant Agreements to which it and any of its Affiliates are a party.  Under no circumstances shall Company be liable for any amounts other than the amounts in this Merchant Agreement, specifically identified in Schedule A. hereto. Merchant covenants that under no circumstances shall it use the Services or those provided under the Merchant Agreement for any purposes that are contrary to those permitted under the Rules or under any and all applicable laws and regulations whether domestic or foreign. Merchant covenants that disclosure of information concerning its transactions hereunder shall not constitute a violation of any applicable Merchant Agreement or any other agreement to which Merchant is a party.

### 5.4 Payments

Merchant must submit preCharge Chargeback Claim Form along with bank verification that funds have been debited, and copy of media requests from Merchant to validate the legitimacy of such Transaction. Merchant understands that Company will not issue a payment on a Chargeback that has not already been debited and in which Merchant has not received final confirmation from its Bank. All Chargeback activity must be received in writing, via fax or mail. It is the Merchant's responsibility to receive confirmation of submitted Transaction. Company is not responsible for lost submissions. In the event of dispute, Merchant must confirm receipt of Transaction activity. Company may hold payment for any Chargeback that it deems to require additional investigation for a period of no more than 180 days. In the event that Company decides not to honor Chargeback warranty claim due to violation of this agreement, Company will notify Merchant within 30 days of its determination.

### 5.4.1 Partial Chargebacks & Retrieval Requests

Merchant agrees that Company shall not be responsible for partial Chargebacks and/or retrieval requests. It is the Merchant's responsibility to respond to any and all retrieval requests. In the event that a Chargeback warranty claim is a direct result of no response to a retrieval request, Merchant agrees to indemnify Company of any warranty claims relating to said Chargeback warranty claim. Merchant further agrees to respond to all retrieval requests within the time allotted by the requesting party and maintain a usable copy of such response.

### 5.5 Submitted Transactions

Chargeback warranty claims submitted and paid to Merchant by Company become property of the Company to do as Company elects to do in an attempt to cover Chargeback costs. Any payments received by cardholder for designated Chargeback by Merchant shall be returned to the Company within 7 days. Any Chargeback warranty claims which are ultimately paid to Merchant by related parties shall be returned to Company. Furthermore, Merchant agrees that in the event said funds are not returned to Company, Merchant authorizes Company to debit Merchant for said Chargeback amount, plus a $35.00 service fee or maximum collection amount authorized by related State and Federal Law.

### 5.6 Remedy

Merchant's exclusive remedy for any warranty claim arising out of or relating to this Agreement will be for the Company, upon receipt of written notice, either (i) to use commercially reasonable efforts to cure, at its expense, the matter that gave rise to the warranty claim for which the Company is at fault, or (ii) return to Merchant the Fees paid by Merchant to the Company for the particular service provided that gives rise to the warranty claim, subject to the limitation contained in Section 5.1. Merchant agrees that it will not allege that this remedy fails its essential purpose. Merchant covenants that in respect of Transactions for which Company assumes liability hereunder, Merchant shall assign and transfer over to Company any and all rights of action which may be reasonably necessary in order to recover funds from a Customer where such right of action for the Merchant exists.

### 5.7 Unpaid Claims Liability

Merchant agrees to indemnify Company and hold Company harmless from any and all Merchants, demands, liability, and causes of action by any person imposed by way of Merchant without commencement of arbitration, litigation, defense, setoff or counterclaim arising from any Transaction activity in violation of this agreement.

## 6. MISCELLANEOUS

### 6.1 Insecurity and Adequate Assurances

If reasonable grounds for insecurity arise with respect to Merchant's ability to pay for the Services in a timely fashion, or otherwise perform hereunder or under the Merchant Agreement, or if the Merchant Agreement is terminated for any reason whatsoever, the Company may demand in writing adequate assurances of Merchant's ability to meet its payment obligations under this Agreement. Unless Merchant provides the assurances in a reasonable time and manner acceptable to the Company, acting in its sole discretion, in addition to any other rights and remedies available, Company may partially or totally suspend its performance hereunder while awaiting assurances, without liability whatsoever to Company.

© 2003-2007 preCharge Risk Management Services  All Rights Reserved.
preCharge Merchant Agreement v0407

 **preCharge**

**preCharge Certified Payments**

**Merchant Agreement**

**6.2 Severability**
Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any remaining provisions, which remaining provisions shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated, and it is hereby declared the intention of the parties that they would have executed the remaining portion of this Agreement without including any such part, parts, or portions which may, for any reason, be hereafter declared invalid. Any provision shall nevertheless remain in full force and effect in all other circumstances.

**6.3 Modification and Waiver**
Waiver of breach of this Agreement by Company shall not be considered a waiver of any other subsequent breach.

**6.4 Independent Contractor**
The Company is an independent contractor of Merchant. The parties will not be considered to be agent, servant, joint venture or partner of the other.

**6.5 Notices**
Merchant shall give the Company written notice within 5 days of obtaining knowledge of the occurrence of any warranty claim or cause of action which Merchant believes that it has, or may seek to assert or allege, against the Company, whether such warranty claim is based in law or equity, arising under or related to this Agreement or to the Transactions contemplated hereby, or any act or omission to act by the Company with respect hereto. If Merchant fails to give such notice to the Company with regard to any such warranty claim or cause of action and shall not have brought legal action for such warranty claim or cause of action within said time period, Merchant shall be deemed to have waived, and shall be forever barred from bringing or asserting such warranty claim or cause of action in any suit, action or proceeding in any court or before any governmental agency or authority or any arbitrator. All notices or other communications hereunder shall be in writing, sent by courier or the fastest possible means, provided that recipient receives a manually signed copy and the transmission method is scheduled to deliver within 24 hours, and shall be deemed given when delivered to the address specified below or such other address as may be specified in a written notice in accordance with this Section. If to the Company: Director of Client Services, preCharge Risk Management Solutions, 130 7th Avenue , 129, New York, New York 10011, Fax, (212) 689-4999 If to Merchant: As reference on this agreement. Any party may, by notice given in accordance with this Section to the other parties, designate another address or person or entity for receipt of notices hereunder.

**6.6 Assignment**
The Agreement is not assignable or transferable by Merchant. The rights and obligations under this agreement shall ensure to the benefit of the successors of prospective parties hereto.

**6.7 Activity**
Merchant agrees that all Transactions received by Merchant shall be processed through the Company's services. Merchant may not selectively process one Transaction over another, except by mutual agreement between Company and Merchant, Merchant's restrictions, stated at the time of the agreement, such as only international transactions.

**6.8 Term**
The term of this agreement is for a period of 6 months starting the date of execution of this Agreement. If this Agreement terminates for any reason prior to the end of such term, a service Fee equal to average preCharge processing volume for the remaining term of the contract plus a $300.00 cancellation fee will be charged.

**6.9 Refund**
Merchant agrees that Company shall at no time be required to issue any refund for any Services rendered. Transaction Fee may be refunded by Company to Merchant, when Company receives written

notification or notification via VOID API within 24 hours of a Merchant cancelling a Transaction.

**6.10 Disputes**
The Company and Merchant recognize that disputes arising under this Agreement are best resolved at the working level by the parties directly involved. Both parties are encouraged to be imaginative in designing mechanisms and procedures to resolve disputes at this level. Such efforts shall include the referral of any remaining issues in dispute to higher authority within each participating party's organization for resolution. Failing resolution of conflicts at the organizational level, the Company and Merchant agree that any remaining conflicts arising out of or relating to this Contract shall be submitted to nonbinding mediation unless the Company and Merchant mutually agree otherwise. If the dispute is not resolved through non-binding mediation, then the parties may take other appropriate action subject to the other terms of this Agreement.

**6.11 Section Headings**
Title and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement and should not be construed as the only related provision.

**6.12 Representations; Counterparts**
Each person executing this Agreement on behalf of a party hereto represents and warrants that such person is duly and validly authorized to do so, on behalf of such party, with full right and authority to execute this Agreement and to bind such party with respect to all of its obligations hereunder. This Agreement may be executed (by original or telecopy signature) in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument without regard to delivery methods of said agreement.

**6.13 Non-solicitation of Employees**
The parties agree that throughout the term of this Agreement and for three (3) years thereafter, none of Merchant, nor any of its affiliates shall hire any of the directors, officers, employees, agents or representatives of the Company so long as such individual remains employed or retained or otherwise affiliated with the Company, without the prior written consent of Company.

**6.14 Service Fees**
A service fee of $150.00 an hour, billed in 15 minute increments will be charged for any support requests that are performed outside the normal course of this agreement including custom installation, modifications or support. This shall include but is not limited to software installation, software modifications, transaction research and/or custom work.

**6.15 Cooperation**
Merchant will cooperate with the Company in taking actions and executing documents, as appropriate, to achieve the objectives of this Agreement. Merchant agrees that the Company's performance is dependent on Merchant's timely and effective cooperation with the Company. Accordingly, Merchant acknowledges that any delay by Merchant may result in the Company being released from an obligation or scheduled deadline or in Merchant having to pay extra fees for the Company's agreement to meet a specific obligation or deadline despite the delay.

**6.16 Governing Law and Construction**
This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of law. The language of this Agreement shall be deemed to be the result of negotiation among the parties and their respective counsel and shall not be construed strictly for or against any party. Each party (i) agrees that any action arising out of or in connection with this Agreement shall be brought solely in courts of the State of New York (ii) hereby consents to the jurisdiction of the courts of the State of New

© 2003-2007 preCharge Risk Management Services   All Rights Reserved
preCharge Merchant Agreement v0407

 **preCharge**

**preCharge Certified Payments**

## Merchant Agreement

York and (iii) agrees that, whenever a party is requested to execute one or more documents evidencing such consent, it shall do so immediately.

#### 6.17 Entire Agreement; Survival
This Agreement, including any Exhibits, states the entire Agreement between the parties and supersedes all previous contracts, proposals, oral or written, and all other communications between the parties respecting the subject matter hereof, and supersedes any and all prior understandings, representations, warranties, agreements or contracts (whether oral or written) between Merchant and the Company respecting the subject matter hereof. This Agreement may only be amended by an agreement in writing executed by the parties hereto.

#### 6.18 Force Majeure
The Company shall not be responsible for delays or failures (including any delay by the Company to make progress in the prosecution of any Services) if such delay arises out of causes beyond its control. Such causes may include, but are not restricted to, acts of God or of the public enemy, fires, floods, epidemics, riots, quarantine restrictions,

strikes, freight embargoes, earthquakes, electrical outages, computer or communications failures, and severe weather, and acts or omissions of subcontractors or third parties.

#### 6.19 Waiver of Trial by Jury.
MERCHANT HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY DISPUTE, ACTION OR CLAIM BASED UPON OR RELATED TO THIS AGREEMENT AND/OR RELATED COUNTERPARTS.

#### 6.21 Statue of Limitations
Merchant hereby agrees that any dispute, action or claim based upon or related to this agreement or related counterparts shall maintain a statutory limitation of one year or the minimum legal allowed time frame as defined under New York State law to commence at the point either party receives notice of such dispute, action or claim.

#### 6.22 Merchant Terms
Merchant shall disclose at all times, related terms, conditions and refunds policies to any requesting parties, including but not limited to Merchant's customers, ISO's and related banks.

**preCharge Merchant Agreement Acceptance**
Merchant accepts the preCharge Merchant Agreement. Merchant acknowledges that all of the information contained in this Merchant Agreement is true, correct, and complete as of the date of this Agreement.

Authorized Signature: X

Print Name:___Pavel Shvartsman

Date:___8/7/2007

© 2003-2007 preCharge Risk Management Services. All Rights Reserved
preCharge Merchant Agreement v0407



**preCharge Certified Payments**

**Merchant Agreement**

**Fax completed form to (212) 689-4999**

| SALES / AGENT ID |
|---|
| |

## MERCHANT INFORMATION

| | |
|---|---|
| **LEGAL NAME:** OpticsPlanet, Inc. | **APPLICATION DATE:** 8/7/2007 |
| **TRADE NAME (DBA):** | **FEDERAL TAX ID / SSN:** 36-439-7726 |
| **WEBSITE:** http://www.OpticsPlanet.com | |

## BUSINESS INFORMATION

| | | |
|---|---|---|
| **ADDRESS:** 3150 Commercial Ave | | |
| **CITY:** Northbrook | **STATE:** IL | **ZIP CODE:** 60082 |
| **PHONE NUMBER:** 847-513-6190 | **FAX NUMBER:** 847-919-3042 | **BUSINESS TYPE:** LLC, Corporation, Sole Proprietor Corporation |

## OWNER INFORMATION

| | | |
|---|---|---|
| **NAME:** Pavel Shvartsman | **TITLE:** President | |
| **ADDRESS:** 5 Hotchkiss Ct | | |
| **CITY:** Lincolnshire | **STATE:** IL | **ZIP CODE:** 60069 |
| **PHONE NUMBER:** 847-513-6190 | **FAX NUMBER:** 847-919-3042 | **EMAIL ADDRESS:** accounting@opticsplanet.com |

### SERVICE OPTIONS & FEES

Fees do not include, without limitation, any service fees currently paid to or payable to providers of Merchant Account Services or parties affiliated or related thereto and do not invalidate any such contracts. This Agreement at no time substitutes any existing agreements between Merchant and any third party. Fees may be adjusted, at the sole and absolute discretion of Company, throughout term hereof, following 30 day written notice by Company.

| FEES | | COVERAGE PLAN – all transactions |
|---|---|---|
| Setup Fee | $ waived | ☒ **Certified Payments** United States, Canada Transactions up to $15,000.00 Per Transaction |
| | | Transaction Fee $ .75    Warranty Coverage Fee 0.75 % |
| Monthly Minimum | $ 1,000.00 | ☒ **Certified Payments W/Premium Approval** *Approved Countries, up to $15,000.00 Per Transaction |
| | | Transaction Fee $ 1.50    Warranty Coverage Fee 1.5 % |
| *APPROVED COUNTRIES Argentina, Australia, Austria, Belgium, Brazil, Chile, Denmark, Finland, France, Germany, Greece, Ireland, Italy, Mexico, Netherlands, New Zealand, Norway, Portugal, South Korea, Spain, Sweden, Switzerland, United Kingdom, Uruguay. | | ☒ **Certified Payments Global W/Premium Approval** Global Coverage, up to $15,000.00 Per Transaction |
| | | Transaction Fee $ 1.50    Warranty Coverage Fee 1.5 % |
| | | *Warranty Coverage Fee applies to total transaction amount (for each transaction over $50.00) |

 **preCharge**

**preCharge Certified Payments**

**Merchant Agreement**

## Payment Authorization
Fax completed form to (212) 689-4999

ACCOUNT NUMBER:4802256086                    ROUTING NUMBER:071025661

BANK NAME:Harris Bank                         **BANK**
CITY/STATE:Barrington, IL

**Authorized Signature:** I hereby authorize preCharge Risk Management Solutions, or third party in accordance with this Agreement to initiate debit/credit entries to deposit account, as indicated above. This authority is to remain in full force and effect until (a) preCharge Risk Management Solutions, has received written notification of its termination, in such a manner as to afford preCharge Risk Management Solutions, reasonable opportunity to act on it and (b) all obligations to preCharge Risk Management Solutions, have been paid in full. This authorization extends, but is not limited, to such entries to this account, which concern fees, transaction fees, penalties, service fees, and return item fees.

Authorized Signature: **X**

Print Name:____Pavel Shvartsman

Date:____8/7/2007

<br>

**ATTACH VOIDED CHECK HERE**

<br>

## PERSONAL GUARANTEE

The undersigned, in consideration of this agreement by preCharge Risk Management Solutions, unconditionally guarantees to preCharge Risk Management Solutions, and assigns and representatives, the payment in full of any and all indebtedness of the debtor, now existing or hereafter arising, together with all interest, attorney's fees, collection costs, and expenses incurred by preCharge Risk Management Solutions. Said guarantee shall be a continuing guarantee and shall remain in full force and effect until all obligations of this agreement to preCharge Risk Management Solutions that have arisen under this Agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern fees, transaction fees, penalties, legal fees, termination fees, service fees, and/or return item fees.

Authorized Signature: **X**

Print Name:____Pavel Shvartsman

Date:____8/7/2007

© 2003-2007 preCharge Risk Management Services  All Rights Reserved.
preCharge Merchant Agreement v0407

# Dell® MFP Laser 3115cn
# Monitor Report

Page: 1 (Last Page)

Local Name        : OpticsPlanet, Inc.
Company Logo      : OpticsPlanet, Inc.

Total Pages Scanned :   1
Total Pages Sent    :   1

Transmission Information

| NO. | JOB | Remote Station | Start Time | Dura | Pages | Mode | Contents | Result |
|-----|-----|----------------|------------|------|-------|------|----------|--------|
| 1 | 0630 | 12126894999 | 06-07 18:04 | 3'00" | 1/1 | ECM | | Done |

## The documents were sent.



**preCharge**                          preCharge Certified Payments

                                       Merchant Agreement

Fax completed form to (212) 869-4999

# Exhibit "B"



preCharge Risk Management Solutions
## Certified Payments Agreement
*Proprietary and Confidential*

This Certified Payments Agreement (this "Agreement") is entered into by and between _____ (the "Merchant") and Regency Global Solutions, Inc., a Delaware corporation dba preCharge Risk Management Solutions (the "Company") in accordance with the following terms:

WHEREAS, the Merchant finds that the Company is willing to perform services hereinafter described in accordance with the provisions of this Agreement; and WHEREAS, the Merchant finds that the Company is qualified to perform the services and that such performance will be in furtherance of Merchant's business; NOW, THEREFORE, in consideration of the mutual covenants set forth herein and intending to be legally bound, the parties hereto agree as follows:

## INTERPRETATION

The following terms shall have the definitions indicated below unless otherwise expressly stated herein:

"Agreement" means this Certified Payments Agreement including, without limitation, any addendums, schedules, amendments revisions or replacements thereof.

"Approved Transaction" means any "Transaction" (as hereinafter defined) that is processed: (i) pursuant to the terms hereof; and (ii) for the benefit of the Merchant.

"Card Association" means Visa, MasterCard or any other "Card" (as hereinafter defined) that provide Cards that are accepted by the Merchant by agreement with a "Member Bank" (as hereinafter defined).

"Card" means a valid credit or debit card as issued under license from Visa or MasterCard or any other valid credit card, charge card or debit card accepted as a method of payment by the Merchant with the prior written approval of the Company.

"Chargeback" means a Transaction that has been returned to the Merchant by the Card Issuer in accordance with the "Rules" (as hereinafter defined).

"Company" has the meaning ascribed thereto in the preamble hereof.

"Customer" means an individual to whom a Card has been issued by a Member Bank and who wishes to purchase goods or services from the Merchant and use such Card to facilitate payment.

"Fees" means the consideration to be paid by the Merchant to the Company for "Services" (as hereinafter defined) rendered by Company hereunder, as further defined on Schedule A attached hereto.

"Fraud Score" means the score provided for all Transactions, ranging from 0 to 1000.

"Member Bank" means any member of Visa or MasterCard that provides "Merchant Services" (as hereinafter defined).

"Merchant" has the meaning ascribed thereto in the preamble hereof.

"Merchant Account" means a specific account established by a Member Bank for the processing of a Merchant's Card Transactions.

"Merchant Agreement" means an agreement between a Member Bank and a merchant, and possibly others, whereby a Member Bank agrees to provide Merchant Services.

"Merchant Services" means the acceptance, processing and collection of Transactions on behalf of merchants by a Member Bank, without limitation, credit review, and approval of a merchant, clearing and settlement of Transactions, customer services, as well as return, Chargeback and retrieval services.

"Rules" means the bylaws, rules, regulations and procedures established by MasterCard and Visa, and any bylaws, rules, regulations and procedures imposed by any other approved Card licensor or issuer.

"Services" has the meaning ascribed thereto in section 1.1 hereof.

"Transaction" means (i) the purchase by a Customer of goods or services from the Merchant, through the use of a Card, which is then presented to a Member Bank for collection; (ii) other types of payment related transactions, (iii) non-purchase transactions between Customers and the Merchant, and (iv) any other transaction related to the Merchant Services.

## 1. SERVICES TO MERCHANT

The Company shall provide to the Merchant the following: Company, whether dealing with the public or otherwise, shall honor, in a non-discriminatory manner, all valid Cards when properly presented as payment in connection with a bona fide, legitimate business Transaction, provided that said Transaction receives a Fraud Score of 750 or below. Access to the Company's secure application programming interface ("API") and all related linking options, as well as the Company's Merchant Interface, shall be provided pursuant to the terms hereof. Subject to the terms hereof, the Company hereby agrees to provide a fraud protection warranty on all Chargeback activity with respect to the Merchant's account with the Company, as more particularly set forth in Section 1.1 below.

### 1.1 Transaction Warranty

The Company hereby agrees to warranty any Company Approved Transaction against fraud or Chargeback, based on the provisions and Fees as defined in this Agreement, provided that Merchant and all of its affiliates are in full compliance of this Agreement and any other agreement with the Company or any of its affiliates, to which they may be a party, and the Merchant maintains a current working relationship with the Company with all current and past Fees due and paid on time and in the amounts agreed (collectively, the "Services"). For greater certainty, Services do not include, without limitation, the supply of any Merchant Account, merchant acquiring services, processing, automated clearing house/electronic funds transfer ("ACH/EFT") transactions, check processing, gateway, gift card, loyalty or shopping cart services, which shall be included in the definition of Merchant Services, which Merchant Services are provided by Member Banks.

## 2. PAYMENT AND INVOICING TERMS

### 2.1 Payment for Services

Payment is due in full in accordance with the Fees as described in this Agreement. The Merchant hereby instructs the Company to debit all Fees via ACH/EFT automated transfers from the bank account designated by the Merchant. The Company reserves the right, in its sole and absolute discretion, to delay the billing of Fees and charges hereunder.

### 2.2 Service Rates

Fees do not include, without limitation, any service fees currently paid to or payable to providers of Merchant Services or parties affiliated or related thereto and do not invalidate any such contracts. This Agreement at no time substitutes any existing agreements between the

Initial Here _____

Last Updated: January 7, 2008. Version 1.0

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.

Exhibit B



Merchant and any third party. Fees may be adjusted, at the sole and absolute discretion of the Company, throughout "Term" (as hereinafter defined) hereof, following sixty (60) days prior written notice by the Company to the Merchant. Merchant can opt to cancel service if rates are unacceptable, with thirty (30) days notice.

All Fees are calculated at the time a Transaction is submitted, based on the Fraud Score as solely determined by the Company, which examines over 100 variables at the time of submission of such Transaction to the Company.

If the Merchant has any valid reason for disputing any portion of an Invoice from the Company, the Merchant must notify the Company in writing within thirty (30) calendar days of receipt of the invoice by the Merchant. If no such notification is given, the Invoice will be deemed valid and accepted by the Merchant. In the case of a dispute, the portion of the Company's invoice which is not in dispute shall be paid in accordance with the procedures set forth herein.

A finance charge of three percent (3%) in excess of the Wall Street Journal Prime Rate as of the day that payment was due, will be charged on past due accounts. Payments by the Merchant will thereafter be applied first to accrued interest and then to the principal unpaid balance. Any attorneys' fees, court costs, or other costs incurred in collection of delinquent accounts shall be paid by the Merchant. If payment of invoices is not current, the Company may terminate the supply of Services without prior notice to the Merchant.

### 2.3 Taxes
All amounts payable pursuant to this Agreement are exclusive of taxes. Accordingly, there will be added to such amount payable by the Merchant the monetary sum equal to any and all current and future applicable taxes, however designated, incurred as a result of or otherwise in connection with this Agreement or the Services, including without limitation sales and local, excise, sales, services, withholding, and use taxes and any taxes or other amounts in lieu thereof paid or payable by the Merchant (other than taxes based on the Merchant's net income). If the Merchant does not pay such taxes, the Company may make such payments and the Merchant will reimburse the Company for those payments. The Merchant will hold the Company harmless for any payments made (or not made) by the Merchant pursuant to this Section 2.3.

### 2.4 Refunds
In order for the Company to set-up the Merchant's account with the Company, the Merchant shall, among other things, purchase a preCharge Merchant ID and related integration support. Ongoing Services include Transaction review, fraud screening and warranty services. Once this Agreement has been executed, no refund shall be honored for any fees that have been paid to the Company. Up to 60 days after a transaction, Merchant may request a void request through the Company API. Warranty fees associated with said transaction will be refunded on the following billing cycle. At Company's sole discretion, Company may limit and require audit of Void transactions submitted.

### 2.5 Representations, Warranties and Covenants of Merchant
Merchant agrees, represents, warrants and covenants to and for the benefit of the Company that as of the execution hereof and during the Term hereof:

    a) Good Standing. If the Merchant is an individual, the Merchant is the age of eighteen (18) years and of the age of majority in the State where they are domiciled and are fully competent to enter into this Agreement. If the Merchant is a entity, it is validly existing and in good standing under the laws of the State where its principal office is located;

    b) Full Authority. The Merchant representative has full authority and power to enter into this Agreement and to perform its obligations under this Agreement;

    c) Sale of Information. The Merchant shall not sell, purchase, provide or exchange credit card, debit card or bank account numbers or Customer or Card holder information, or any information collected or received hereunder, to any third party, any and all such information being the sole and exclusive property of the Member Bank of the Merchant;

    d) No Violation. Merchant's performance of this Agreement will not violate any applicable law or regulation or any agreement to which it is bound as of the date hereof, including, without limitation, the Merchant Agreement;

    e) Enforceability. This Agreement represents a valid obligation of the Merchant and is fully enforceable against it;

    f) Compliance. The Merchant will comply with the terms of this Agreement, with all applicable Card Association and ACH network rules, including, without limitation, those of the National Automated Clearing House Association (NACHA), and with all applicable state and federal laws and regulations and any agreement between the Company and a Member Bank, as well as all applicable Member Bank ethics statements;

    g) No Litigation. Neither the Merchant, nor its officers or directors, nor any affiliates of the Merchant are a party to any pending litigation that would have an impact on this Agreement and have never been fined or penalized by Visa, MasterCard, NACHA or any other association in the credit, payments or banking industry;

    h) No Crime. Neither the Merchant nor any of its principles has ever been convicted of a crime punishable by greater than 365 days of incarceration or of a crime of dishonesty;

    i) Laws. The Merchant agrees that it will not perform any act which would violate New York State or United States Federal Law or any other applicable domestic or foreign law.

### 3. CHANGES

The Merchant may, with the approval of the Company, issue written directions within the general scope of any Services to be ordered. Such changes (the "Change Order") may be for additional work or the Company may be directed to change the direction of the work covered by the Change Order, but no change will be allowed unless agreed to by the Company in writing. The Merchant agrees and acknowledges that changes in the Services may entail increases in Fees, as determined by the Company.

### 4. STANDARD OF CARE

The Company warrants that its Services shall be performed by personnel possessing competency consistent with applicable industry standards. Other than the warranty set forth in the immediately preceding sentence and the transaction warranty set forth in Section 1.1 hereof (which is subject to the terms and limitations of Section 5 hereof), no other representation, express or implied, and no warranty or guarantee is included or intended in this Agreement, or in any report, opinion, deliverable, work product, document or otherwise.

Initial Here 

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.



**preCharge Risk Management Solutions**

**Certified Payments Agreement**

*Proprietary and Confidential*

Furthermore, no guarantee is made as to the efficacy or value of any Services performed or software developed.

THIS SECTION SETS FORTH THE ONLY WARRANTIES PROVIDED BY THE COMPANY CONCERNING THE SERVICES AND RELATED WORK PRODUCT. THIS WARRANTY IS MADE EXPRESSLY IN LIEU OF ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY, NON-INFRINGEMENT, TITLE OR OTHERWISE EXPRESSED IN THIS AGREEMENT.

### 5. LIABILITY

#### 5.1 Exclusions from the Transaction Warranty

The Merchant agrees that the Company shall not be responsible for any of the following types of Transactions: (i) a Transaction that does not receive an Approved Transaction code; (ii) a Transaction submitted before the final execution of this Agreement; (iii) a Transaction that does not receive Member Bank approval; (iv) a Transaction exceeding the maximum allowed limit under this Agreement, as set forth on Schedule A; (v) a Transaction submitted by a Customer previously known to the Merchant to have fraudulent or Chargeback activity; (vi) a Transaction that does not match the Chargeback amount; (vii) a Transaction that has failed requirements, in the event of requirements made by the Member Bank; (viii) a Transaction that does not fall under the Merchant's standard internal operations or other operations; (ix) a Transaction that has already received a partial refund; (x) a Transaction submitted in an attempt to receive multiple approval codes for a single Transaction; (xi) a Transaction for a Customer who is a shareholder, director, officer, employee, agent or representative of the Merchant or any of its affiliates; (xii) a Transaction that has been knowingly by the Merchant submitted in violation of any applicable Rule, law or regulation; and (xiii) a Transaction submitted when the Merchant is in violation of any applicable Rule, law or regulation.

#### 5.2 Limitation

The Company's liability, including but not limited to the Merchant's claims of contributions and indemnification related to third party claims arising out of Services rendered by the Company, and for any losses, injury or damages to persons or properties or work performed arising out of or in connection with this Agreement and for any other claim, shall be limited to payment received by the Company from the Merchant for the particular Service provided giving rise to the claim minus any payments made to the Company with respect to such Transaction and Fees for Services rendered. Notwithstanding anything to the contrary in this Agreement, the Company shall not be liable for any special, indirect, consequential, lost profits, or punitive damages. The Merchant agrees to limit the Company's liability to the Merchant and any other third party for any damage on account of any error, omission or negligence to a sum not to exceed the payment received by the Company for the particular Service provided giving rise to the claim. The limitation of liability set forth herein is for any and all matters for which the Company may otherwise have liability arising out of or in connection with this Agreement, whether the claim arises in contract, tort, statute, or otherwise. Company assumes no liability for any fines imposed on the Merchant by Visa, MasterCard or any other association of banks or regulatory agency.

#### 5.3 Processing

At no time will the Company be held liable for any Transaction submitted by the Merchant that does not fall under the Merchant's standard operations or charged by the Merchant Merchant Account for another business's activity. The Merchant shall provide the Company with a list of all Merchant Agreements to which it and any of

its affiliates are a party. Under no circumstances shall the Company be liable for any amounts other than the amounts in this Agreement, specifically identified on Schedule A attached hereto. The Merchant covenants that under no circumstances shall it use the Services for any purposes that are contrary to those permitted under the Rules or under any and all applicable laws and regulations whether domestic or foreign. The Merchant covenants that disclosure of information concerning its Transactions hereunder shall not constitute a violation of any applicable Merchant Agreement or any other agreement to which the Merchant is a party.

#### 5.4 Payments

The Merchant must submit a preCharge Chargeback Claim Form along with bank verification that funds have been debited, and a copy of made requests from the Member Bank, to validate the legitimacy of such Transaction. The Merchant understands that the Company will not issue a payment on a Chargeback that has not already been debited and in which the Merchant has not received final confirmation from its Member Bank. All Chargeback activity must be received in writing, via fax or mail. It is the Merchant's responsibility to receive confirmation of a submitted Transaction. The Company is not responsible for lost submissions. In the event of dispute, the Merchant must confirm receipt of the Transaction activity in writing. The Company may hold payment for any Chargeback that it deems to require additional investigation for a period of no more than 180 days. In the event that the Company decides not to honor Chargeback warranty claim due to a violation of this Agreement, the Company will notify the Merchant within thirty (30) days of the Company's determination.

#### 5.4.1 Partial Chargebacks & Retrieval Requests

The Merchant agrees that the Company shall not be responsible for partial Chargebacks and/or retrieval requests. It is the Merchant's responsibility to respond to any and all retrieval requests. In the event that a Chargeback warranty claim is a direct result of no response to a retrieval request, the Merchant agrees to indemnify the Company for any warranty claims relating to said Chargeback warranty claim. The Merchant further agrees to respond to all retrieval requests within the time allotted by the requesting party and maintain a usable copy of such response.

#### 5.5 Submitted Transactions

Chargeback warranty claims submitted and paid to the Merchant by Company become the property of the Company to do as the Company elects to do in an attempt to cover the Chargeback costs. Any payments received by a Customer for a designated Chargeback by the Merchant shall be returned to the Company within seven (7) days. Any Chargeback warranty claims which are ultimately paid to the Merchant by related parties shall be returned to the Company. Furthermore, the Merchant agrees that in the event said funds are not returned to the Company, the Merchant authorizes the Company to debit the Merchant's bank account for said Chargeback amount, plus a $35.00 service fee or a maximum collection amount authorized by related State and Federal Law.

#### 5.6 Remedy

The Merchant's exclusive remedy for any warranty claim arising out of or relating to this Agreement will be for the Company, upon receipt of written notice, either (i) to use commercially reasonable efforts to cure, at its expense, the matter that gave rise to the warranty claim for which the Company is at fault, or (ii) return to the Merchant the Fees paid by the Merchant to the Company for the particular service provided that gives rise to the warranty claim, subject to the limitations contained in this Section 5. The Merchant agrees that it will not allege that this remedy fails its essential purpose. The Merchant covenants that in respect of Transactions for which the Company assumes liability

Initial Here ____

Last Updated: January 7, 2008. Version 1.0

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.



hereunder, the Merchant shall assign and transfer over to the Company and any and all rights of action which may be reasonably necessary in order to recover funds from a Customer where such right of action for the Merchant exists.

**5.7 Unpaid Claims Liability**
The Merchant agrees to indemnify the Company and hold the Company harmless from any and all of the Merchant's demands, liability, and causes of action by any person imposed by way of Merchant without commencement of arbitration, litigation, defense, setoff or counterclaim arising from any Transaction activity in violation of this Agreement.

## 6. MISCELLANEOUS

**6.1 Insecurity and Adequate Assurances**
If reasonable grounds for insecurity arise with respect to the Merchant's ability to pay for the Services in a timely fashion, or otherwise perform hereunder or under the Merchant Agreement, or if the Merchant Agreement is terminated for any reason whatsoever, the Company may demand adequate assurances, in writing, of the Merchant's ability to meet its payment obligations under this Agreement. Unless the Company provides the assurances in a reasonable time and manner acceptable to the Company, acting in its sole discretion, in addition to any other rights and remedies available, the Company may partially or totally suspend its performance hereunder while awaiting assurances, without liability whatsoever to the Company.

**6.2 Severability**
Should any part of this Agreement for any reason be declared invalid, such decision shall not affect the validity of any remaining provisions, which remaining provisions shall remain in full force and effect as if this Agreement had been executed with the invalid portion thereof eliminated, and it is hereby declared that the intention of the parties is that they would have executed the remaining portion of this Agreement without including any such part, parts, or portions which may, for any reason, be hereafter declared invalid. Any provision shall nevertheless remain in full force and effect in all other circumstances.

**6.3 Modification and Waiver**
Waiver of a breach of this Agreement by the Company shall not be considered a waiver of any other subsequent breach.

**6.4 Independent Contractor**
The Company is an independent contractor of the Merchant. The parties will not be considered to be an agent, servant, joint venturer or partner of the other.

**6.5 Notices**
The Merchant shall give the Company written notice within five (5) days of obtaining knowledge of the occurrence of any warranty claim or cause of action which the Merchant believes that it has, or may seek to assert or allege against the Company, whether such warranty claim is based in law or equity, arising under or related to this Agreement or to the Transactions contemplated hereby, or any act or omission to act by the Company with respect hereto. If the Merchant fails to give such notice to the Company with regard to any such warranty claim or cause of action and shall not have brought legal action for such warranty claim or cause of action within said time period, the Merchant shall be deemed to have waived, and shall be forever barred from bringing or asserting such warranty claim or cause of action in any suit, action or proceeding in any court or before any governmental agency or authority or any arbitrator. All notices or other communications hereunder shall be in writing, sent by courier or the fastest possible means, provided that recipient receives a manually signed copy and the transmission method is scheduled to deliver within 24 hours, and

shall be deemed given when delivered to the address specified below or such other address as may be specified in a written notice in accordance with this Section 6.5. If to the Company: Director of Client Services, preCharge Risk Management Solutions, 130 7th Avenue, 120, New York, New York 10011, Fax (212) 589-4990. If to Merchant: to the address set forth on Schedule A attached hereto. Any party may, by notice given in accordance with this Section 6.5 to the other parties, designate another address or person or entity for receipt of notices hereunder.

**6.6 Activity**
The Merchant agrees that all Transactions received by the Merchant shall be processed through the Company's Services. The Merchant may not selectively process one Transaction over another, except by mutual agreement between the Company and the Merchant, as well as the Merchant's restrictions stated at the time of this Agreement.

**6.7 Term**
The term of this Agreement is for a period of six (6) months commencing as of the date of full execution of this Agreement (the "Term"). If this Agreement terminates for any reason prior to the end of such Term, and merchant ceases processing, a service fee equal to the Merchant's average processing volume for a period of 30 days, plus a $500.00 cancellation fee will be charged to the Merchant.

**6.8 Disputes**
The Company and the Merchant recognize that disputes arising under this Agreement are best resolved at the working level by the parties directly involved. Both parties are encouraged to be imaginative in designing the mechanism and procedures to resolve disputes at this level. Such efforts shall include the referral of any remaining issues in dispute to higher authority within each participating party's organization for resolution. Failing resolution of conflicts at the organizational level, the Company and the Merchant agree that any remaining conflicts arising out of or relating to this Agreement shall be submitted to non-binding mediation unless the Company and the Merchant mutually agree, otherwise. If the dispute is not resolved through non-binding mediation, then the parties may take other appropriate action subject to the other terms of this Agreement.

**6.9 Section Headings**
Title and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement and should not be construed as the only related provision.

**6.10 Representations; Counterparts**
Each person executing this Agreement on behalf of a party hereto represents and warrants that such person is duly and validly authorized to do so, on behalf of such party, with full right and authority to execute this Agreement and to bind such party with respect to all of its obligations hereunder. This Agreement may be executed (by original or (telecopy signature) in counterparts, each of which shall be deemed an original, but all of which, when taken together shall constitute one and the same instrument without regard to delivery methods of said Agreement.

**6.11 Non-solicitation of Employees**
The parties agree that throughout the Term of this Agreement and for three (3) years thereafter, neither the Merchant, nor any of its affiliates shall hire any of the directors, officers, employees, agents or representatives of the Company so long as such individual remains employed or retained or otherwise affiliated with the Company, without the prior written consent of Company.

**6.12 Service Fees**

Initial Here

Last Updated: January 7, 2008, Version 1.0

© 2003-2008, preCharge Risk Management Solutions, All Rights Reserved.



**preCharge Risk Management Solutions**

**Certified Payments Agreement**

*Proprietary and Confidential*

A service fee of $150.00 an hour, billed in 15 minute increments will be charged for any support requests that are performed outside the normal course of this Agreement, including, but not limited to, custom installation, modifications or support. This shall also include, but is not limited to, software installation, software modifications, transaction research and/or custom work.

**6.13 Cooperation**
The Merchant will cooperate with the Company in taking actions and executing documents, as appropriate, to achieve the objectives of this Agreement. The Merchant agrees that the Company's performance is dependent on the Merchant's timely and effective cooperation with the Company. Accordingly, the Merchant acknowledges that any delay by the Merchant may result in the Company being released from an obligation or scheduled deadline or in the Merchant having to pay extra fees for the Company's agreement to meet a specific obligation or deadline despite the delay.

**6.14 Governing Law and Construction**
This Agreement will be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of conflicts of law. The language of this Agreement shall be deemed to be the result of negotiation among the parties and their respective counsel and shall not be construed strictly for or against any party. Each party (i) agrees that any action arising out of or in connection with this Agreement shall be brought solely in courts of the State of New York, (ii) hereby consents to the jurisdiction of the courts of the State of New York and (iii) agrees that whenever a party is requested to execute one or more documents evidencing such consent, it shall do so immediately.

**6.15 Entire Agreement; Survival**
This Agreement, including any Exhibits, Schedules and Addenda, states the entire Agreement between the parties and supersedes all previous contracts, proposals, oral or written, and all other

communications between the parties respecting the subject matter hereof, and supersedes any and all prior understandings, representations, warranties, agreements or contracts (whether oral or written) between the Merchant and the Company respecting the subject matter hereof. This Agreement may only be amended by an agreement in writing executed by the parties hereto.

**6.16 Force Majeure**
The Company shall not be responsible for delays or failures (including any delay by the Company to make progress in the prosecution of any Services) if such delay arises out of causes beyond its control. Such causes may include, but are not limited to, acts of God or of the public enemy, terrorism, fires, floods, epidemics, riots, quarantine restrictions, strikes, freight embargoes, earthquakes, electrical outages, computer or communications failures, and severe weather, and acts or omissions of subcontractors or third parties.

**6.17 Waiver of Trial by Jury**
THE MERCHANT HEREBY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY DISPUTE, ACTION OR CLAIM BASED UPON OR RELATED TO THIS AGREEMENT AND/OR RELATED COUNTERPARTS.

**6.18 Statue of Limitations**
The Merchant hereby agrees that any dispute, action or claim based upon or related to this Agreement or related counterparts shall maintain a statutory limitation of one year, or the minimum legal time frame permitted under New York State law, which period shall commence at the point either party receives notice of such dispute, action or claim from the other party in writing.

**6.20 Merchant Terms**
The Merchant shall disclose at all times, related terms, conditions and refunds policies to any requesting parties, including by not limited to the Merchant's Customers, independent sales offices and related banks.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by a duly authorized person as of the date and year indicated above. By signing below the Merchant hereby accepts this Certified Payments Agreement. Merchant acknowledges that all of the information contained in this Certified Payments Agreement is true, correct, and complete as of the date of this Agreement.

**MERCHANT**

OpticsPlanet, Inc.

Signature: _____
Title: CEO
Name: (print) Mark Levitin
Date: 3/3/08

**COMPANY**

Regency Global Solutions, Inc., a Delaware corporation
dba preCharge Risk Management Solutions

By: _____
Title: _____
Name: (print) _____
Date: _____

**Personal Guarantee**

In consideration of the Company entering into this Agreement with the Merchant, the undersigned hereby unconditionally guarantees to the Company and its assigns and representatives, the payment in full of any and all indebtedness of the Merchant, now existing or hereafter arising under this Agreement, together with all interest, attorneys' fees, collection costs, and expenses incurred by the Company in connection therewith. This guarantee shall be a continuing guarantee and shall remain in full force and effect until all obligations of the Merchant to the Company arising under this Agreement have been paid in full. This authorization extends, but is not limited, to such entries to this account which concern fees, transaction fees, penalties, legal fees, termination fees, service fees, and/or return item fees.

Signature _____                    Date  3/3/08

Print Name:  Mark Levitin

Initial Here _____

5 of 7

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.

 **preCharge**

preCharge Risk Management Solutions
Certified Payments Agreement
*Proprietary and Confidential*

## Schedule A

Please fax this completed Schedule A, along with
an executed copy of the Certified Payments
Agreement to (212) 689-4999

| SALES / AGENT ID |
| --- |

### MERCHANT INFORMATION

| | |
| --- | --- |
| LEGAL NAME:<br>OpticsPlanet, Inc. | APPLICATION DATE:<br>3/3/2008 |
| TRADE NAME [DBA]: | FEDERAL TAX ID / SSN:<br>36-439-7726 |
| WEBSITE:<br>http://www.OpticsPlanet.com | |

### BUSINESS INFORMATION

| ADDRESS:<br>3150 Commercial Ave | | |
| --- | --- | --- |
| CITY:<br>Northbrook | STATE:<br>IL | ZIP CODE:<br>60062 |
| PHONE NUMBER:<br>847-513-8180 | FAX NUMBER:<br>847-919-3042 | BUSINESS TYPE: LLC, Corporation, Sole Proprietor<br>Corporation |

### OWNER INFORMATION

| NAME:<br>Mark Levitin | TITLE:<br>CEO | |
| --- | --- | --- |
| ADDRESS:<br>3150 Commercial Ave | | |
| CITY:<br>Northbrook | STATE:<br>IL | ZIP CODE:<br>60062 |
| PHONE NUMBER:<br>847-513-8180 | FAX NUMBER:<br>847-919-3042 | EMAIL ADDRESS:<br>accounting@opticsplanet.com |

### SERVICE INFORMATION

| SERVICE TYPE:<br>Certified Payments | SETUP FEE:<br>waived | APPLICATION FEE:<br>waived |
| --- | --- | --- |
| TRANSACTION FEE:<br>see below | WARRANTY FEE:<br>see below | MONTHLY MINIMUM:<br>$1,000.00 |

☒    **Certified Payments**  United States, Canada Transactions up to $15,000.00 Per Transaction

    Transaction Fee  $  .45    Warranty Coverage Fee 0.45 %

☒    **Certified Payments W/Premium Approval** Global Coverage. up to $15,000.00 Per Transaction

    Transaction Fee  $  0.90    Warranty Coverage Fee 0.90 %

☒    **Certified Payments**  United States, Canada Transactions between $15,000.00 and $30,000.00 Per Transaction

    Transaction Fee  $  .60    Warranty Coverage Fee 0.60 %

☒    **Certified Payments W/Premium Approval** Global Coverage. between $15,000.00 and $30,000.00 Per Transaction

    Transaction Fee  $  1.15    Warranty Coverage Fee 1.15 %

Initial Here ⌒

Last Updated: January 7, 2008, Version 1.0

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.

 **preCharge**

**preCharge Risk Management Solutions**

**Certified Payments Agreement**

*Proprietary and Confidential*

Please fax this completed Payment
Authorization Form to (212) 689-4999

## PAYMENT AUTHORIZATION FORM

### MERCHANT INFORMATION

| | |
|---|---|
| LEGAL NAME:<br>OpticsPlanet, Inc. | APPLICATION DATE:<br>3/3/2008 |
| TRADE NAME (DBA): | FEDERAL TAX ID / SSN:<br>36-439-7726 |

ACCOUNT NUMBER: 4802256086        ROUTING NUMBER: 071025661

BANK NAME: Harris                    **BANK:**
CITY/STATE:Barrington,IL

**Authorized Signature:** The Merchant hereby authorizes the Company, or a third party designated by the Company in accordance with this Certified Payments Agreement, to initiate debit/credit entries to the bank account indicated above. This authorization is to remain in full force and effect until (a) the Company has received written notification of the termination of such authorization, in such a manner as to afford the Company a reasonable opportunity to act on it and (b) all obligations to the Company have been paid in full. This authorization extends, but is not limited to entries to this account which contain fees, transaction fees, penalties, service fees, and return item fees.

MERCHANT

OpticsPlanet, Inc.

Signature:
Title: CEO
Name: (print) Mark Levitin
Date: 3/3/08

```
ATTACH VOIDED CHECK HERE
```

Initial Here

Last Updated: January 7, 2008, Version 1.0

© 2003-2008, preCharge Risk Management Solutions. All Rights Reserved.

# Dell® MFP Laser 3115cn
# Monitor Report

Page 1 (Last Page)

Local Name        : OpticsPlanet, Inc.
Company Logo      : OpticsPlanet, Inc.

Total Pages Scanned : 7
Total Pages Sent    : 7

Transmission Information

| No. | Job# | Remote Station | Start Time | Dura. | Pages | Mode | Comments | Result |
|-----|------|----------------|------------|-------|-------|------|----------|--------|
| 1 | 0049 | 12126603000 | 03-03-00:32PM | 4:18" | 7/7 | G3 | | Done |

## The documents were sent.


preCharge

preCharge Risk Management Solutions
### Certified Payments Agreement
*Proprietary and Confidential*

Exhibit "C"

Huge Discrepansies                                                    Page 1 of 5

From:        "Andrii Krainosvit" <andrii.krainosvit@opticsplanet.com>
Subject:     Huge Discrepansies
Date:        Tue, March 11, 2008 8:40 pm
To:          "'Howard Schecter'" <howie@precharge.com>

Howie,

During the recent audit, we found several huge discrepancies in preCharge
statements.

For example, the latest daily report for 03/10/2008 contains the following
information.

Range : 2008/03/10 00:00:00 to 2008/03/10 23:59:59

Approved : $94473.52 (268 Transactions)

Declined : $4633.32 (17 Transactions)

preCharge Fees : $909.37

However, our audit results show the following:

Type

Transactions

Value

Transaction Fee

Warranty Fee

Total Fees

Declined

13

$3,384.44

$0.00

$0.00

$0.00

*Exhibit C*

Huge Discrepansies

Accepted

225

$80,395.49

$101.25

$361.78

$463.03

Voided

41

$14,219.35

($18.45)

($63.99)

($82.44)

Declined (Global)

7

$1,484.88

$0.00

$0.00

$0.00

Accepted (Global)

40

$12,586.09

$36.00

$113.27

$149.27

Voided (Global)

7

$4,190.22

($6.30)

Huge Discrepansies

($37.71)

($44.01)

Total:

$485.86

Report for 03/09/2008.

Range : 2008/03/09 00:00:00 to 2008/03/09 23:59:59

Approved : $20307.94 (72 Transactions)

Declined : $1373.89 (3 Transactions)

preCharge Fees : $206.27

Type

Transactions

Value

Transaction Fee

Warranty Fee

Total Fees

Declined

3

$1,373.89

$0.00

$0.00

$0.00

Accepted

51

$15,303.47

$22.95

$68.87

$91.82

Voided

14

$1,759.10

($6.30)

($7.92)

($14.22)

Declined (Global)

0

$0.00

$0.00

$0.00

$0.00

Accepted (Global)

21

$5,023.16

$18.90

$45.21

$64.11

Voided (Global)

5

$1,013.96

($4.50)

($9.13)

($13.63)

Total:

$128.08

And so on.

Can you please clarify this situation?

Andrii Krainosvit
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
http://www.OpticsPlanet.com <http://www.opticsplanet.com/>

**Attachments:**

| untitled-2 |
| --- |
| Size: 51 k |
| Type: text/html |

| | |
|---|---|
| From: | "Andrii Krainosvit" <andrii.krainosvit@opticsplanet.com> |
| Subject: | Critical Issues |
| Date: | Fri, March 14, 2008 1:24 pm |
| To: | "'Howard Schecter'" <howie@precharge.com> |
| Cc: | mark.levitin@opticsplanet.com |

Howard,


There are several open critical issues that my Executive Management is
getting really concerned about.

I have been bringing most of them to your attention multiple times during
the past several weeks.

Frankly, the time is up! The timely resolution of these issues is
imperative for continuation of our business relationships.


In order for me to continue presenting preCharge as a reliable business
partner internally I have to have these issues resolved by Friday, March
21st, 2008.


Here is the list of issues again:


1.        Rate

You continue collecting fees from us according to the old rates, even
though we executed the new agreement as of 03/03/2008. We need to have
this addressed ASAP. We need to receive a refund equal to 40% of the fees
you collected during the period from 03/03/2008 through the date you
actually adjust your system to the new rates.


2.        Discrepancies

There are huge discrepancies when comparing your email statements to our
internal reports. We need to get an explanation to this based on the
two-day data sample include in Attachment 1. We also need to get a
detailed transaction report for the period from 08/13/2007 through
03/03/2008, which I requested from you THREE times in my emails on
02/28/2008, 02/27/2008, and 03/03/2008. Please provide it in the format
presented in Attachment 2.


3.        Claim resolution

a.        We are not receiving payments for pending claims in a timely
manner. Katrina and I have been contacting you regarding this issue
several times on 02/12/2008, 02/13/2008, 02/27/2008, 02/29/2008, and

03/03/2008 with the list of the claims in question, but the issue still
has not been resolved. Some of those claims were submitted to you as
early as November 2007. We need to get a detailed status report for the
claims listed in Attachment 3.
b.      On 02/12/2008 we mutually agreed to confirm each submitted claim
to ensure they are received on your side. Katrina has been sending you
email notifications upon faxing you over claim forms, but she never
received any confirmations from you.


4.      Email statements

a.      We have not been receiving Weekly and Monthly reports since the
beginning of November 2007. The last monthly report we received was for
the period from 2007/09/01 00:00:00 trough 2007/09/30 23:59:59. The last
weekly report we received was for the period from 2007/11/19 00:00:00
through 2007/11/25 23:59:59. I pointed out this problem to you on
01/10/2008, but it still has not been resolved.
b.      All the email statements are not detailed enough to provide any
useful information for us. They only provide us with the total of the
preCharge fees, which we can see on our bank statement anyway. We need
you to make them more detailed and in the format presented in Attachment
2.


5.      Order cancellation requests that you have been sending us since
02/13/2008

a.      It does not seem that this practice conforms to the terms of the
Agreement?
b.      Are you contacting our customers? How do you introduce yourself?
What scripts do you use when speaking to them?
c.      Apparently, preCharge lacks ANY understanding of our internal
operations:

                                               i.      You
frequently request us to cancel legitimate orders.

                                       ii.      You
request us to cancel orders that are already on the "conveyer belt" and
most of the time cannot be cancelled without disrupting our internal
operations, even if the packages have not been physically shipped out yet.

d.      In a nutshell, this pretty much defeats the main purpose of us
utilizing your services, which is to save time and streamline our
operations.


6.      Level of customer service

a.      We have received no response to multiples requests to address some
of the critical issues described above.


In addition, I would like to set up a conference call today to discuss the
above ssues. I will try to make my CEO and/or CFO available on our side.

In turn, please have appropriate people join us on your side.

Andrii Krainosvit

Business Analyst
 <mailto:Andrii.Krainosvit@OpticsPlanet.com>
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
 <http://www.opticsplanet.com/> http://www.OpticsPlanet.com

Attachment 1

Range : 2008/03/10 00:00:00 to 2008/03/10 23:59:59

Approved : $94473.52 (268 Transactions)

Declined : $4633.32 (17 Transactions)

preCharge Fees : $909.37

However, our audit results show the following:

Type

Transactions

Value

Transaction Fee

Warranty Fee

Total Fees

Declined

13

$3,384.44

$0.00

$0.00

$0.00

Accepted

225

$80,395.49

$101.25

$361.78

$463.03

Voided

41

$14,219.35

($18.45)

($63.99)

($82.44)

Declined (Global)

7

$1,484.88

$0.00

$0.00

$0.00

Accepted (Global)

40

$12,586.09

$36.00

$113.27

$149.27

Voided (Global)

7

$4,190.22

($6.30)

($37.71)

($44.01)

Total:

$485.86

Report for 03/09/2008.

Range : 2008/03/09 00:00:00 to 2008/03/09 23:59:59

Approved : $20307.94 (72 Transactions)

Declined : $1373.89 (3 Transactions)

preCharge Fees : $206.27

Type

Transactions

Value

Transaction Fee

Warranty Fee

Total Fees

Declined

3

$1,373.89

$0.00

$0.00

$0.00

Accepted

51

$15,303.47

$22.95

$68.87

$91.82

Voided

14

$1,759.10

($6.30)

($7.92)

($14.22)

Declined (Global)

0

$0.00

$0.00

$0.00

$0.00

Accepted (Global)

21

$5,023.16

$18.90

$45.21

$64.11

Voided (Global)

5

$1,013.96

Critical Issues                                                    Page 7 of 9


($4.50)

($9.13)

($13.63)

Total:




$128.08



Attachment 2


1.       Date

a.       Approved Transactions

                                         i.        Transaction ID

                                        ii.       Invoice #

                                       iii.       Amount

                                        iv.       Transaction Fee

                                         v.       Warranty Fee

b.       Declined Transactions

                                         i.        Transaction ID

                                        ii.       Invoice #

                                       iii.       Amount

c.       Voided Transactions

                                         i.        Parent
Transaction ID

                                        ii.       Transaction ID

                                       iii.       Invoice #

                                        iv.       Amount

            v.      Transaction Fee

          vi.     Warranty Fee

d.     Total Approved (quantity and $)

e.     Total Declined (quantity and $)

f.     Total Voided (quantity and $)

g.     Total preCharge Fees

Attachment 3

119851532514SQKL

119367168314TSIN

119851360514KKOF

119748728414CMLN

119705998814LULQ

119695050714CCTC

119689116114FFJN

119645366314TCJS

119619699314MMQO

119377210914KRFK

119548761014LUCT

119306292114GPNQ

119125312814FGOJ

119021831014OKRO

119099011414UQKF

120041555114TQTM

119955154314KSDG

119324800914QUSP

119998177014GJLN

119678772814LHSJ

119816482814OQCP

120095073014VCIR

119972238614EUQC

120033508514TEKG

120060247114IGSV

120006944014DSVU

120101329314LCQM

120102034214TVKO

120075987214KSPG

119738758414JCGM

119722452914ITQN

120222224014JETT

120051672214EDUM

119868898114IOQU

119991289214QHFG

**Attachments:**

| untitled-2 |
| Size: 94 k |
| Type: text/html |

Exhibit "D"



3150 Commercial Avenue, Northbrook, IL 60062   Phone: 847-513-6201   Fax: 847-919-3003   E-mail: Info@OpticsPlanet.com

April 15, 2008

**Via UPS Overnight and Fax (212) 689-4999**

Director of Client Services
preCharge Risk Management Solutions
130 7th Avenue, 129
New York, New York 10011

Re:  Termination of Certified Payments Agreement

Dear Sir/Madam,

I am writing to inform you that effective immediately, we are terminating that certain Certified Payments Agreement ("Agreement"), by and between OpticsPlanet, Inc. ("OpticsPlanet"), and Regency Global Solutions, Inc., dba preCharge Risk Management Solutions (the "Company"). Pursuant to Section 2.2 of the Agreement, we notified your representative, Howard Schecter, in email correspondence dated March 11, 2008, and March 14, 2008, that the Company was continuing to collect fees according to old rates, even though the Agreement was executed as of March 3, 2008 (See correspondence attached hereto as Exhibit A). In this email correspondence, OpticsPlanet put the Company on notice that not only was the use of the old rates unacceptable, but also in violation of the Agreement. However, the Company failed to correct the rate structure. As a result of this breach by the Company, and other violations by the Company enumerated in this letter, OpticsPlanet has no choice but to cancel the Agreement.

During the term of our agreements with the Company, OpticsPlanet has paid in excess of $120,611.02 (see calculation set forth in Exhibit B) for certain services to be provided by the Company. In reality, the Company failed to provide the promised services under the agreements. Again, the critical problems and issues are set forth in items 1 through 6 in the March 14 email to Howard Schecter, and attached hereto as Exhibit A. In response, the Company and Mr. Schecter, provided apologies, and excuses of staff shortages and "busy times" in email correspondence dated March 15 and March 19 (attached hereto in Exhibit A), but the Company failed to cure the problems and open issues. Meantime, the customer service and quality of approvals deteriorated, and Visa/MasterCard became extremely concerned with the increase in fraudulent chargebacks. Further, the Company cancelled a substantial number of legitimate orders, thus damaging the business reputation of OpticsPlanet, and in many cases ruining its relationships with customers.

Although, the Agreement is terminated, the Company continues to owe OpticsPlanet $67,083.21 for total claims pending, and $33,087.35 for the discrepancy in fees collected from OpticsPlanet (See calculation attached hereto as Exhibit B). **Therefore, we demand the aggregate payment of $100,890.56, by no later than 5:00 PM (CST) on April 28, 2008**. If this payment is not made,

*Exhibit D*                    1

OpticsPlanet intends to pursue further claims for the damage that the Company caused in ruining OpticsPlanet reputation with its customers, disrupting operations at OpticsPlanet and losing opportunity costs.

It is our intention to attempt to resolve this situation amicably in order to avoid unnecessary legal costs and further business disruptions for both parties. However, if we are not able to reach an amicable resolution, and the payment indicated above is not promptly made, we will instruct our legal counsel to immediately proceed with any and all legal remedies available to us, and to seek the substantial recovery for all the damage that was sustained by our business. As a symbol of OpticsPlanet's good faith OpticsPlanet is willing to sign a confidential settlement agreement in connection with the prompt payment of the outstanding $100,890.56. Further, OpticsPlanet will agree to mutual non-disparagement provisions, that would among other things, prevent OpticsPlanet from negatively commenting on the Company's overall poor performance to any parties in the general marketplace, including, without limitation, OpticsPlanet's long list of contacts in the e-commerce world, and specifically 30,000 + stores that are members of Yahoo Merchant Solutions.

This letter is sent to you without prejudice to any other legal remedies, at law and in equity, which OpticsPlanet may exercise. Please contact me to make arrangements for payment sought, and direct any and all inquiries, telephone calls, correspondence and other communications regarding the foregoing to me at the information listed above.

Sincerely,

OpticsPlanet, Inc.

Mark Levitin
CEO

2

## Exhibit A

Correspondence between OpticsPlanet and Company

## Exhibit B

Calculation of Unpaid Pending Claims and Discrepancy in Fees

## Andrii Krainosvit

**From:**     Howard Schecter [howie@precharge.com]
**Sent:**     Thursday, March 13, 2008 3:05 PM
**To:**        Andrii Krainosvit
**Subject:** RE: Huge Discrepansies

Andrii,

I sent this to Accounting, when I get a response I will relay it back.

Howard Schecter
HSchecter@precharge.com
**preCharge Risk Management Solutions**
Phone, (212) 751-6213, Extension 305
Fax: (212) 689-4999

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone. The integrity and security of this message cannot be guaranteed on the Internet.

**From:** Andrii Krainosvit [mailto:andrii.krainosvit@opticsplanet.com]
**Sent:** Tuesday, March 11, 2008 9:40 PM
**To:** Howard Schecter
**Subject:** Huge Discrepansies
**Importance:** High

Howie,

During the recent audit, we found several huge discrepancies in preCharge statements.
For example, the latest daily report for 03/10/2008 contains the following information.

Range : 2008/03/10 00:00:00 to 2008/03/10 23:59:59
Approved : $94473.52 (268 Transactions)
Declined : $4633.32 (17 Transactions)
preCharge Fees : $909.37

However, our audit results show the following:

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fees |
|---|---|---|---|---|---|
| Declined | 13 | $3,384.44 | $0.00 | $0.00 | $0.00 |
| Accepted | 225 | $80,395.49 | $101.25 | $361.78 | $463.03 |
| Voided | 41 | $14,219.35 | ($18.45) | ($63.99) | ($82.44) |
| Declined (Global) | 7 | $1,484.88 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 40 | $12,586.09 | $36.00 | $113.27 | $149.27 |
| Voided (Global) | 7 | $4,190.22 | ($6.30) | ($37.71) | ($44.01) |
| Total: | | | | | $485.86 |

Report for 03/09/2008.

Range : 2008/03/09 00:00:00 to 2008/03/09 23:59:59
Approved : $20307.94 (72 Transactions)
Declined : $1373.89 (3 Transactions)
preCharge Fees : $206.27

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fees |
|---|---|---|---|---|---|
| Declined | 3 | $1,373.89 | $0.00 | $0.00 | $0.00 |
| Accepted | 51 | $15,303.47 | $22.95 | $68.87 | $91.82 |
| Voided | 14 | $1,759.10 | ($6.30) | ($7.92) | ($14.22) |

| Declined (Global) | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 21 | $5,023.16 | $18.90 | $45.21 | $64.11 |
| Voided (Global) | 5 | $1,013.96 | ($4.50) | ($9.13) | ($13.63) |
| Total: | | | | | $128.08 |

And so on.

Can you please clarify this situation?

**Andrii Krainosvit**
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
http://www.OpticsPlanet.com

## Andrii Krainosvit

| | |
|---|---|
| **From:** | Howard Schecter [howie@precharge.com] |
| **Sent:** | Wednesday, March 19, 2008 4:31 PM |
| **To:** | Andrii Krainosvit |
| **Cc:** | mark.levitin@opticsplanet.com |
| **Subject:** | RE: Critical Issues |

Andrii,

I do apologize. Typically we try to address regular issues within 2 to 5 business days, sometimes shorter, sometimes longer. When it comes to custom or detailed requests, we try to resolve them in 2 to 3 weeks, often times shorter. Unfortunately, you caught us at a very busy time, typically our busy time of year starts in May as most try to get in before the holiday break, but this year it started in February. We are now in the process of beefing up staff to compensate for all the new interest in preCharge.

Regarding your specific requests, I've already asked all the various departments that these matters be rushed, I expect that I'll have many of your request reports back no later than Monday and everything you've requested back no later than the same week's Thursday. It seems that the biggest issues really center around claims. I can tell you that our claims department was rather taken back by the sudden influx in claims which required additional scrutiny. I will ask that they release as many of the open claims as they can and that we move forward on that.

If I can ask, if you have one-off issues, the best approach will be to send billing related matters to billing@precharge.com and support items to support@precharge.com – while I can address some matters, I often just send out requests that way, as well. The reason being that they get placed in queue and it's much easier to track and prioritize. Plus by doing that, if for whatever reason a department doesn't respond within a timely matter, I can then go back and ask them to rush, showing them that the open item is weeks behind.

Thank you for your support and patience.

---Howie

**From:** Andrii Krainosvit [mailto:andrii.krainosvit@opticsplanet.com]
**Sent:** Tuesday, March 18, 2008 5:43 PM
**To:** Howard Schecter
**Cc:** mark.levitin@opticsplanet.com
**Subject:** RE: Critical Issues
**Importance:** High

Look Howard, it is not about us being *"happy or unhappy"* with you or preCharge.

You took time to write me an email at 2 am Eastern Time on Friday and I greatly appetite it. However, you did not answer ANY of my questions, which by no means *"go well beyond your "normal" process and as such do take a lot longer to produce."*

Please take a look at my email again and answer my questions point by point. I separated the "normal" issues by highlighting them in red!
These are the most critical and basic questions.

**Andrii Krainosvit**
Business Analyst
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
http://www.OpticsPlanet.com

**From:** Howard Schecter [mailto:howie@precharge.com]
**Sent:** Saturday, March 15, 2008 12:59 AM
**To:** Andrii Krainosvit
**Cc:** mark.levitin@opticsplanet.com
**Subject:** RE: Critical Issues

Andrii,

I am sorry I hadn't gotten back to you earlier, I had been away with a client Friday afternoon.

Andrii, we've always tried to work with optics and give you guys the items that you've needed but you must understand that many of your requests and specific demands go well beyond our "normal" process and as such do take a lot longer to produce. With that said, we'll get you the details that you need next week as soon as they are available but all in all, if you are unhappy with me or the preCharge service, I suggest that we cancel your contract immediately. It's never our goal or intention to keep a client in a situation or relationship that they do not feel is working and if you feel that your needs aren't being met, then I suggest that we do that.

Regardless of that, again, you have to realize that we continue to provide you with support and services well beyond or initial contract and service term. Typically, clients would be charged for the level of support and details that you are asking for, but that is not the case here. Certainly if you would prefer that we deliver the additional requests in a more timely manner, we can do so but you will then start paying for that level of support which starts at $150.00 an hour which frankly I don't believe is your intention. As for more detailed statements, that simply will not happen without additional support cost. We will provide you the normal statements as well as detailed statements but in terms of your specific formats, that's going to be up to you guys to prepare.

In terms of cancelling orders, that is not only our legal but contractual right to do so. If we identify an order to be fraudulent, we are going to stop it, whether its after approval or even after shipping. Fact is that your company's preCharge fees are far less than the actual liablity and as such, we will do what we can to protect our interest in this relationship.

As for claims, our risk department has felt that the claims need additional scrutiny and as such we are investigating those claims. I don't have the specifics but I do know that a few are in question which is the cause for the delay.

Let me know how you'd like to proceed because again I would never ask a client to be held to a relationship that they don't feel is meeting their needs and it's clear that unless you are willing to cover the cost of all the extra layers of support that you are requesting, I am not sure what more you'd like for us to do. Additionally, if you feel that we will not try to prevent fraud even after an approval, then we've not made our internal operations clear as we will prevent fraud at all cost, even if it means stopping an order after it's been processed.

The next available time I have is Wednesday, let me know if that works.

**Howard Schecter**
hschecter@precharge.com
**preCharge Risk Management Solutions**
Phone, (212) 751-6213, Extension 305
Fax: (212) 689-4999

This message is confidential. It may also be privileged or otherwise protected by work product immunity or other legal rules. If you have received it by mistake, please let us know by e-mail reply and delete it from your system; you may not copy this message or disclose its contents to anyone. The integrity and security of this message cannot be guaranteed on the Internet.

**From:** Andrii Krainosvit [andrii.krainosvit@opticsplanet.com]
**Sent:** Friday, March 14, 2008 2:24 PM
**To:** Howard Schecter
**Cc:** mark.levitin@opticsplanet.com
**Subject:** Critical Issues

Howard,

There are several open critical issues that my Executive Management is getting really concerned about.
I have been bringing most of them to your attention multiple times during the past several weeks.
**Frankly, the time is up! The timely resolution of these issues is imperative for continuation of our business relationships.**

In order for me to continue presenting preCharge as a reliable business partner internally I have to have these issues resolved by Friday, March 21st, 2008.

Here is the list of issues again:

1. **Rate**

You continue collecting fees from us according to the old rates, even though we executed the new agreement as of 03/03/2008. We need to have this addressed ASAP. We need to receive a refund equal to 40% of the fees you collected during the period from 03/03/2008 through the date you actually adjust your system to the new rates.

2. **Discrepancies**
   There are huge discrepancies when comparing your email statements to our internal reports. We need to get an explanation to this based on the two-day data sample include in Attachment 1. We also need to get a detailed transaction report for the period from 08/13/2007 through 03/03/2008, which I requested from you **THREE** times in my emails on 02/28/2008, 02/27/2008, and 03/03/2008. Please provide it in the format presented in Attachment 2.

3. **Claim resolution**
   a. We are not receiving payments for pending claims in a timely manner. Katrina and I have been contacting you regarding this issue several times on 02/12/2008, 02/13/2008, 02/27/2008, 02/29/2008, and 03/03/2008 with the list of the claims in question, but the issue still has not been resolved. Some of those claims were submitted to you as early as November 2007. We need to get a detailed status report for the claims listed in Attachment 3.
   b. On 02/12/2008 we mutually agreed to confirm each submitted claim to ensure they are received on your side. Katrina has been sending you email notifications upon faxing you over claim forms, but she never received any confirmations from you.

4. **Email statements**
   a. We have not been receiving Weekly and Monthly reports since the beginning of November 2007. The last monthly report we received was for the period from 2007/09/01 00:00:00 trough 2007/09/30 23:59:59. The last weekly report we received was for the period from 2007/11/19 00:00:00 through 2007/11/25 23:59:59. I pointed out this problem to you on 01/10/2008, but it still has not been resolved.
   b. All the email statements are not detailed enough to provide any useful information for us. They only provide us with the total of the preCharge fees, which we can see on our bank statement anyway. We need you to make them more detailed and in the format presented in Attachment 2.

5. **Order cancellation requests that you have been sending us since 02/13/2008**
   a. It does not seem that this practice conforms to the terms of the Agreement?
   b. Are you contacting our customers? How do you introduce yourself? What scripts do you use when speaking to them?
   c. Apparently, preCharge lacks **ANY** understanding of our internal operations:
      i. You frequently request us to cancel legitimate orders.
      ii. You request us to cancel orders that are already on the "conveyer belt" and most of the time cannot be cancelled without disrupting our internal operations, even if the packages have not been physically shipped out yet.
   d. In a nutshell, this pretty much defeats the main purpose of us utilizing your services, which is to **save time and streamline our operations.**

6. **Level of customer service**
   a. We have received no response to multiples requests to address some of the critical issues described above.

In addition, I would like to set up a conference call today to discuss the above issues. I will try to make my CEO and/or CFO available on our side. In turn, please have appropriate people join us on your side.

**Andrii Krainosvit**
Business Analyst
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
http://www.OpticsPlanet.com

**Attachment 1**

Range : 2008/03/10 00:00:00 to 2008/03/10 23:59:59
Approved : $94473.52 (268 Transactions)
Declined : $4633.32 (17 Transactions)
preCharge Fees : $909.37

However, our audit results show the following:

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fees |
|---|---|---|---|---|---|
| Declined | 13 | $3,384.44 | $0.00 | $0.00 | $0.00 |
| Accepted | 225 | $80,395.49 | $101.25 | $361.78 | $463.03 |
| Voided | 41 | $14,219.35 | ($18.45) | ($63.99) | ($82.44) |
| Declined (Global) | 7 | $1,484.88 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 40 | $12,586.09 | $36.00 | $113.27 | $149.27 |
| Voided (Global) | 7 | $4,190.22 | ($6.30) | ($37.71) | ($44.01) |
| Total: | | | | | $485.86 |

Report for 03/09/2008.

Range : 2008/03/09 00:00:00 to 2008/03/09 23:59:59
Approved : $20307.94 (72 Transactions)
Declined : $1373.89 (3 Transactions)
preCharge Fees : $206.27

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fees |
|---|---|---|---|---|---|
| Declined | 3 | $1,373.89 | $0.00 | $0.00 | $0.00 |
| Accepted | 51 | $15,303.47 | $22.95 | $68.87 | $91.82 |
| Voided | 14 | $1,759.10 | ($6.30) | ($7.92) | ($14.22) |
| Declined (Global) | 0 | $0.00 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 21 | $5,023.16 | $18.90 | $45.21 | $64.11 |
| Voided (Global) | 5 | $1,013.96 | ($4.50) | ($9.13) | ($13.63) |
| Total: | | | | | $128.08 |

**Attachment 2**

1. Date
   a. Approved Transactions
      i.   Transaction ID
      ii.  Invoice #
      iii. Amount
      iv.  Transaction Fee
      v.   Warranty Fee
   b. Declined Transactions
      i.   Transaction ID
      ii.  Invoice #
      iii. Amount
   c. Voided Transactions
      i.   Parent Transaction ID
      ii.  Transaction ID
      iii. Invoice #
      iv.  Amount
      v.   Transaction Fee
      vi.  Warranty Fee
   d. Total Approved (quantity and $)
   e. Total Declined (quantity and $)
   f. Total Voided (quantity and $)
   g. Total preCharge Fees

**Attachment 3**

119851532514SQKL
119367168314TSIN
119851360514KKOF
119748728414CMLN

```
119705998814LULQ
119695050714CCTC
119689116114FFJN
119645366314TCJS
119619699314MMQO
119377210914KRFK
119548761014LUCT
119306292114GPNQ
119125312814FGOJ
119021831014OKRO
119099011414UQKF
120041555114TQTM
119955154314KSDG
119324800914QUSP
119998177014GJLN
119678772814LHSJ
119816482814OQCP
120095073014VCIR
119972238614EUQC
120033508514TEKG
120060247114IGSV
120006944014DSVU
120101329314LCQM
120102034214TVKO
120075987214KSPG
119738758414JCGM
119722452914ITQN
120222224014JETT
120051672214EDUM
119868898114IOQU
119991289214QHFG
```

## Summary

| | |
|---|---|
| Total Discrepancy in Fees | $33,807.35 |
| Total Claims Pending | $67,083.21 |
| Total Amount Owed to OP | $100,890.56 |
| | |
| Total Calculated Fees | $86,803.67 |
| Total Fees Collected from OP | $120,611.02 |
| Total Discrepancy in Fees | $33,807.35 |

## Actual Fees Collected and Claims Pending

### Old Agreement (08/13/2007 - 03/03/2008)

| | |
|---|---|
| Fees Collected | $108,128.41 |
| Claims Paid | $32,778.89 |
| Claims Pending | $52,490.12 |

### New Agreement (03/04/2008 - 04/11/2008)

| | |
|---|---|
| Fees Collected | $20,483.51 |
| Claims Paid | $0.00 |
| Claims Pending | $4,593.09 |
| Estimated Future Claims | $10,000.00 |
| Total Claims Pending | $14,593.09 |

### Life Time (08/13/2007 - 04/11/2008)

| | |
|---|---|
| Fees Collected | $120,611.02 |
| Claims Paid | $32,778.89 |
| Claims Pending | $57,083.21 |
| Estimated Future Claims | $10,000.00 |
| Total Claims Pending | $67,083.21 |

## Calculated Fees

### Old Agreement (08/13/2007 - 03/03/2008)

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fee |
|---|---|---|---|---|---|
| Declined | 1912 | $885,826.58 | $0.00 | $0.00 | $0.00 |
| Accepted | 21058 | $8,872,527.59 | $15,793.50 | $66,543.96 | $82,337.46 |
| Voided | 4202 | $1,984,957.94 | ($3,151.50) | ($14,887.18) | ($18,038.68) |
| Declined (Global) | 2354 | $813,541.51 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 2757 | $830,639.94 | $4,135.50 | $12,459.60 | $16,595.10 |
| Voided (Global) | 785 | $276,389.02 | ($1,177.50) | ($4,145.84) | ($5,323.34) |
| Total: | | | | | $75,570.54 |

### New Agreement (03/04/2008 - 04/11/2008)

| Type | Transactions | Value | Transaction Fee | Warranty Fee | Total Fee |
|---|---|---|---|---|---|
| Declined | 242 | $155,090.14 | $0.00 | $0.00 | $0.00 |
| Accepted | 4786 | $1,982,123.04 | $2,153.70 | $8,919.55 | $11,073.25 |
| Voided | 1083 | $483,270.19 | ($487.35) | ($2,174.72) | ($2,662.07) |
| Declined (Global) | 201 | $83,493.33 | $0.00 | $0.00 | $0.00 |
| Accepted (Global) | 1349 | $443,952.17 | $1,214.10 | $3,995.57 | $5,209.67 |
| Voided (Global) | 539 | $211,402.75 | ($485.10) | ($1,902.62) | ($2,387.72) |
| Total: | | | | | $11,233.13 |

Exhibit "E"

RE: preCharge API Integration Guide                                          Page 1 of 6

From:      "Howie Schecter" <howie@PreCharge.com>
Subject:   RE: preCharge API Integration Guide
Date:      Wed, August 1, 2007 9:19 am
To:        "Andrii Krainosvit" <andrii.krainosvit@opticsplanet.com>
Cc:        "Pavel Shvartsman" <pavel@opticsplanet.com>

Andrii,

1)      Many of the field types you will see with preCharge use "fuzzy
match" technology so in that case, US, USA or United States should all
function the same.

2)      Being that preCharge doesn't take a one size fits all approach,
the service is tailored to all types of merchants. Some merchants will
submit to preCharge and then preCharge will submit to their gateway or
processors, others will submit to preCharge and then they will submit to
their gateway or processor and some even submit to their gateway or
processor and then to preCharge. In the event that we submit to your
gateway or processor and you want us to void the transaction on the
gateway or processor side, you would include the transaction id associated
with the gateway or process and we would in turn void out the transaction
on that side as well.

3)      That is correct, once we receive the completed application back,
either the account you are working with will go into live status or the
preferably way would be to continue using that account you have now for
testing and another account would be setup for live purposes, our
merchants can do either case. In both cases, once your account is live,
you will be able to control every function in the interface.

4)      The MO/TO interface uses a 4 digit pin code rather than security
keys. The reason being that most of our merchants use the front end
interface for their call centers or service reps and would rather not
provide, disclose or confuse those reps with two 10 digit alpha numeric
security keys. Whereas on the backend, those security keys are typically
embedded within the programming language.


---Howie



From: Andrii Krainosvit [mailto:andrii.krainosvit@opticsplanet.com]
Sent: Tuesday, July 31, 2007 7:39 PM
To: Howie Schecter
Cc: 'Pavel Shvartsman'
Subject: RE: preCharge API Integration Guide


Howie,


Thank you for the information.  I have a few more questions:            *Exhibit E*

1.        Do you specifically require a 2-letter country code or country
name will work?
2.        What is Gateway TransactionID in the VOID API?
3.        How do I update profile in the merchant backend?  I wanted to add
an email to our profile in order to be able to test notification emails,
but when I fill in the new information in the form nothing happens and I
get returned to the previous page.  I spoke to the tech online and he said
that this is a test account and therefore no changes are allowed.
4.        Just out of curiosity, why is the authenticating method is
different for MO/TO and online transactions?


Thanks,



Andrii Krainosvit
 <mailto:Andrii.Krainosvit@OpticsPlanet.com>
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
 <http://www.opticsplanet.com/> http://www.OpticsPlanet.com


From: Howie Schecter [mailto:howie@PreCharge.com]
Sent: Tuesday, July 31, 2007 5:18 PM
To: Andrii Krainosvit
Cc: Pavel Shvartsman
Subject: RE: preCharge API Integration Guide


Forgot to attach the Response Codes Guide.


---Howie




From: Howie Schecter
Sent: Tuesday, July 31, 2007 5:39 PM
To: Andrii Krainosvit
Cc: 'Pavel Shvartsman'
Subject: RE: preCharge API Integration Guide


Hello Andrii,

1)      For the certified payments program, that is not a requirement.
The only time we will need the ship to address is when you submit
chargeback claims.

2)      I have attached the MOTO API as well as you will find information
below regarding the online interface for processing these transactions.

3)      That is a separate process. Typically, merchants will submit
those manually so that we can confirm each one but I have attached the API
but certainly I wouldn't recommend that holding up the initial
integration.

4)      To ensure that we have the correct information on file, we do
require a country code, which ensures that there is no confusion for some
of our international merchants.


Additionally, being that you are doing the integration on your backend and
clearly have an advanced automated process, I have attached our advanced
response codes which may give you some insight into the transaction
responses themselves. Certainly not a requirement, but available to you.


MOTO Identifiers:

Merchant ID: 1185902745880145

Passcode: 4345



I've also include the Transaction Report API.


Let me know if you have any questions.


Best,


Howie Schecter
howie@precharge.com

preCharge Risk Management Solutions
Phone, (212) 751-6213, Extension 305

Fax: (212) 689-4999

This message is confidential. It may also be privileged or otherwise

protected by work product immunity or other legal rules. If you have
received it by mistake, please let us know by e-mail reply and delete it
from your system; you may not copy this message or disclose its contents
to anyone. The integrity and security of this message cannot be guaranteed
on the Internet.

From: Andrii Krainosvit [mailto:andrii.krainosvit@opticsplanet.com]
Sent: Tuesday, July 31, 2007 4:27 PM
To: Howie Schecter
Cc: 'Pavel Shvartsman'
Subject: RE: preCharge API Integration Guide

Hi Howie,

My name is Andrii and I am an Implementation Specialist at OpticsPlanet,
Inc.  I will be your primary contact for all implementation and tech
support issues.

I looked through the API Integration Guide and I have a few questions.  I
would appreciate if you could forward them your tech people.

1.        You do not requite us to submit a ship to address, right?
2.        The guide states that IP address and customer's email are required
fields and if we do not submit those the transaction will be rejected.
How do we process manual/offline orders in this case?
3.        The guide does not describe refund request API that you have
mentioned during the conference call.
4.        In case of a domestic order, can the
ecom_billto_postal_countrycode field be blank?

We look forward to working with you too.

Thanks,

Andrii Krainosvit
 <mailto:Andrii.Krainosvit@OpticsPlanet.com>
Andrii.Krainosvit@OpticsPlanet.com
Tel/Fax: (847) 919-3074
 <http://www.opticsplanet.com/> http://www.OpticsPlanet.com

From: Pavel Shvartsman [mailto:pavel@opticsplanet.com]
Sent: Tuesday, July 31, 2007 1:01 PM
To: 'Andrii Krainosvit'
Cc: Sergii@OpticPlanet.com
Subject: FW: preCharge API Integration Guide


Andrii,


Take a look and we will talk


Best Regards,

Pavel

http://www.OpticsPlanet.com



From: Howie Schecter [mailto:howie@PreCharge.com]
Sent: Tuesday, July 31, 2007 12:46 PM
To: Pavel Shvartsman
Subject: preCharge API Integration Guide


Pavel,


The API Integration Guide is attached.


You can use the following identifiers for using the API:


Merchant ID: 1185902745880145

Security Key 1: oFZhzTbtWr

Security Key 2: FAdhtNCmrR


You can log in to the merchant backend here:`

  <https://secure.precharge.net/> https://secure.precharge.net

Merchant ID: 1185902745880145

Password:    optics111

Let me know if you have any questions, I can have one of my tech people
assigned to your tech person to help with anything.

I look forward to working with you.

Best,

Howie Schecter
howie@precharge.com

preCharge Risk Management Solutions
Phone, (212) 751-6213, Extension 305

Fax: (212) 689-4999

This message is confidential. It may also be privileged or otherwise
protected by work product immunity or other legal rules. If you have
received it by mistake, please let us know by e-mail reply and delete it
from your system; you may not copy this message or disclose its contents
to anyone. The integrity and security of this message cannot be guaranteed
on the Internet.

**Attachments:**

| untitled-2 |
| --- |
| Size: 43 k |
| Type: text/html |



**Moritt Hock**
**Hamroff & Horowitz** LLP
A T T O R N E Y S   A T   L A W

Joshua B. Summers
Email: jsummers@moritthock.com

July 23, 2008

*Sent via Federal Express Priority Overnight*
Anthony J. Costantini, Esq.
Duane Morris LLP
1540 Broadway
New York, New York

Re:    **OpticsPlanet, Inc. v. Regency Global Solutions, Inc., d/b/a Precharge Risk**
**Management Solutions**  08-CV-6465 *(JS)*
**US Dist. Ct., SDNY, Case No.** ~~07-CV-7001~~ **(RJS)(FM)**

Dear Mr. Costantini:

We represent OpticsPlanet, Inc. ("Plaintiff") in the above referenced matter.

Pursuant to my conversation with your colleague, Peter W. Rothberg, your firm has agreed to accept service on behalf of the above-named Defendant, Regency Global Solutions, Inc., d/b/a Precharge Risk Management Solutions ("Defendant"). To that end, I have included herewith a copy of the summons and complaint recently filed in the United States District Court in and for the Southern District of New York. Please acknowledge your receipt and acceptance of service of the within Summons and Complaint on behalf of the Defendant herein by signing this letter in the space provided and returning the original to my office.

Thank you for your attention to this matter.

Very truly yours,

Joshua B. Summers, Esq.

**Acknowledgement of receipt and acceptance of service**
**of Summons and Complaint on behalf of Defendant**

Anthony J. Costantini, Esq.
*Counsel for Defendant*

cc: Peter W. Rothberg (w/o enclosures)

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
OPTICSPLANET, INC.,

                 Plaintiff,

                                        **CERTIFICATE OF SERVICE**

                v.

REGENCY GLOBAL SOLUTIONS, INC.
dba PRECHARGE RISK MANAGEMENT
SOLUTIONS,

                 Defendant.
-------------------------------------------------------------------X
STATE OF NEW YORK)
                   ) ss.:
COUNTY OF NASSAU )

       Linda E. DeSantis , being duly sworn, deposes and says:

       I am not a party to the action, am over 18 years of age and reside in Nassau County, New York.

       On the 23rd day of July, 2008, I served a true copy of the Summons, Complaint and Rule 7.1 Disclosure of Corporate Affiliations by dispatching said Summons, Complaint and Rule 7.1 Disclosure of Corporate Affiliations via Federal Express/Overnight Delivery (Weekday Service) to the following addressee(s) as indicted below.

                 Anthony J. Costantini, Esq.
                 Duane Morris LLP
                 1540 Broadway
                 New York, New York

Said papers were deposited on said date in the custody of said overnight delivery service prior to the latest time designated for overnight delivery; to wit:  6:00 P.M.

                                             Linda E. DeSantis

Sworn to before me this
25th day of July, 2008

   Notary Public

JOSHUA B. SUMMERS
Notary Public, State of New York
No. 02SU6124368
Qualified in Nassau County
Commission Expires 03/28/20 O 9

F:\OpticsPlanet\Regency Global\docs\AOS  S&C.doc

ECF

# U.S. District Court
# United States District Court for the Southern District of New York (Foley Square)
# CIVIL DOCKET FOR CASE #: 1:08-cv-06465-RJS

| | |
|---|---|
| Opticsplanet, Inc. v. Regency Global Solutions, Inc | Date Filed: 07/19/2008 |
| Assigned to: Judge Richard J. Sullivan | Jury Demand: None |
| Cause: 28:1332 Diversity-Breach of Contract | Nature of Suit: 190 Contract: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Opticsplanet, Inc.**
*an Illinois corporation*

represented by **Michael Cardello, III**
Moritt Hock Hamroff & Horowitz LLP
(Nassau)
400 Garden City Plaza, Suite 202
Garden City, NY 11530
(516) 873-2000
Fax: (516)-873-2010
Email: mcardello@moritthock.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Regency Global Solutions, Inc**
*doing business as*
Precharge Risk Management Solutions,
a Delaware corporation

| Date Filed | # | Docket Text |
|---|---|---|
| 07/19/2008 | 1 | COMPLAINT against Regency Global Solutions, Inc. (Filing Fee $ 350.00, Receipt Number 657190)Document filed by Opticsplanet, Inc..(rdz) (Entered: 07/22/2008) |
| 07/19/2008 | | SUMMONS ISSUED as to Regency Global Solutions, Inc. (rdz) (Entered: 07/22/2008) |
| 07/19/2008 | | Magistrate Judge Frank Mass is so designated. (rdz) (Entered: 07/22/2008) |
| 07/19/2008 | | Case Designated ECF. (rdz) (Entered: 07/22/2008) |

| 07/19/2008 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Opticsplanet, Inc..(rdz) (Entered: 07/22/2008) |
|---|---|---|
| 07/29/2008 | 3 | CERTIFICATE OF SERVICE. Regency Global Solutions, Inc served on 7/23/2008, answer due 8/12/2008. Service was accepted by Anthony J. Costantini, Esq., Authorized Agent. Service was made by FedEx. Document filed by Opticsplanet, Inc.., CERTIFICATE OF SERVICE of Summons, Complaint and Statment pursuant to Rule 7.1 Disclosure of Corporate Affiliations served on REGENCY GLOBAL SOLUTIONS, INC. d/b/a PRECHARGE RISK MANAGEMENT SOLUTIONS on 7/23/2008. Service was accepted by Anthony J. Costantini, Esq., Authorized Agent. Service was made by FedEx. Document filed by Opticsplanet, Inc.. (Attachments: # 1 Exhibit Letter by authorized agent accepting service on behalf of defendant)(Summers, Joshua) (Entered: 07/29/2008) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 08/21/2008 08:49:39 | | |
| **PACER Login:** | mh0059 | **Client Code:** optics planet |
| **Description:** | Docket Report | **Search Criteria:** 1:08-cv-06465-RJS |
| **Billable Pages:** | 1 | **Cost:** 0.08 |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| OPTICSPLANET, INC., an Illinois corporation | ) ) ) | Case No.: 08 Civ. 6465 (RJS) |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLERK'S CERTIFICATE** |
| REGENCY GLOBAL SOLUTIONS, INC. d/b/a PRECHARGE RISK MANAGEMENT SOLUTIONS, a Delaware corporation | ) ) ) ) ) | |
| Defendant. | ) | |

I, J. MICHAEL MCMAHON, Clerk of the United States District Court for the

Southern District of New York, do hereby certify that this action commenced on July 19,

2008 with the filing of a Summons and Complaint, a copy of the Summons and

Complaint was served on Defendant by serving Anthony J. Constantini, Esq., authorized

agent of Defendant herein via Federal Express on July 23, 2008, and proof of such

service thereof was filed on July 29, 2008.

I further certify that the docket entries indicate that the Defendant has not filed an

Answer or otherwise moved with respect to the Complaint herein. The default of the

Defendant is hereby noted.

Dated: New York, New York
        August 21, 2008

                            **J. MICHAEL MCMAHON**
                            Clerk of the Court

                            By: _____
                                    Deputy Clerk

F:\OpticsPlanet\Regency Global\docs\Clerk's Certificate 08 21 08.doc